**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| JORDELLA ROBINSON, individually and as a representative of a class of similarly situated borrowers, <br> Plaintiff, <br><br> vs. <br><br> Standard Mortgage Corporation and Standard Mortgage Insurance Agency, Inc., <br><br> Defendants. | Civil Case No.: <br><br> **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Jordella Robinson, on behalf of herself and as a representative of a class of similarly situated borrowers, brings the claims set forth below against Standard Mortgage Corporation ("Standard Mortgage") and Standard Mortgage Insurance Agency, Inc. ("SM Insurance") (collectively, "Defendants").

**NATURE OF THE ACTION**

1.      Plaintiff and members of the Class (as defined below) have or had loans or lines of credit owned, originated, and/or serviced by Standard Mortgage secured by their property and were charged for "force-placed" insurance pursuant to exclusive agreements between Standard Mortgage and SM Insurance that returned significant  financial benefits to Standard Mortgage unrelated to any contractual or other *bona fide* interest in protecting Standard Mortgage's interest in the loan or the property, resulting in unauthorized and unfairly inflated costs to borrowers in violation of the law and the underlying mortgages.

2.      Throughout the proposed Class Period (defined below) Standard Mortgage would replace borrowers lapsed insurance policies with "force-placed" or "lender-placed" insurance

and would "force-place" duplicative and unnecessary insurance on borrowers. Such policies offer less coverage, are substantially more expensive, and provide lucrative financial benefits to Standard Mortgage and SM Insurance.

3.      Standard Mortgage exploited its contractual authority to force-place insurance in order to reap additional profits in the form of unjustified commissions and other forms of consideration at the expense of borrowers whose insurance was force-placed. Sometimes the consideration was disguised as reimbursements for certain costs or was a percentage of the force-placed premiums, subsidized or discounted administrative services, or lucrative captive reinsurance deals. These improper benefits were not legitimately related to the cost of the force-placed insurance or the purposes for which force-placed insurance is purchased – to protect the lender's interest in the mortgaged property.

4.      Standard Mortgage charges borrowers for the "cost" of procuring force-placed insurance but a portion of this purported "cost" is returned, transferred or paid back to Standard Mortgage and/or its affiliated entities.

5.      SM Insurance also benefitted financially from the force placed insurance practices at issue in this Complaint.

6.      Among other things, Plaintiff and members of the Class seek to recover treble damages under RICO, or, in the alternative, damages equal to the amount of the improper and inequitable financial benefit received by Defendants and/or their affiliates as a result of this anti-consumer and predatory practice.

7.      The premiums paid by and/or assessed to Plaintiff and members of the Class also included amounts not attributable to the cost of providing force-placed insurance but, instead, constituted expenses associated with servicing the loans. The percentage of borrowers who were

charged for force-placed insurance were shouldering the costs of monitoring Standard

Mortgage's entire loan portfolio – effectively providing kickbacks to Standard Mortgage in the

form of below-market, outsourced insurance services.

8.      As one journalist observed of the industry:

> In the pantheon of modern-day mortgage abuses, force-placed
> insurance hasn't attracted much attention. But it generates
> hundreds of millions of dollars a year in fees and commissions for
> insurance companies, banks and other financial institutions.
>
> Policies are sometimes backdated to cover periods that have
> already passed. In essence, critics say, high-priced insurance
> policies cover a time when no events happened. And often, the
> mortgage company and the force-placed-insurance company are
> affiliated, with the mortgage company receiving a "service fee" in
> return for the business. But homeowners don't know that.

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star

Telegram (June 12, 2012), available at https://watchdognation.com/force-placed-insurance-

mortgage.

9.      Recently, regulatory authorities around the country have started to investigate the

forced-placed insurance practices of lenders and servicers like Standard Mortgage and insurance

companies like SM Insurance. For example, the New York State Department of Financial

Services ("NYSDFS") convened hearings in 2012 to investigate the force-placed insurance

industry. On the opening day of these hearings, NYSDFS Superintendent Benjamin Lawsky

("Superintendent Lawsky") noted that his department's initial inquiry uncovered "serious

concerns and red flags" which included: (a) exponentially higher premiums for force-placed

insurance than regular insurance; (b) extraordinarily low loss ratios; (c) harm to distressed

borrowers; (d) lack of competition in the market; (e) increased reliance on force-placed insurance

as a major profit center for both banks and insurers; and (f) "tight relationships between banks,

their subsidiaries and insurers." *See* generally Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services (May 17, 2012), attached hereto as Exhibit 1.

10.     As Superintendent Lawsky summarized:

> In some cases this takes the form of large commissions being paid by insurers to the banks for what appears to be very little work. In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies. Thus, the banks pay high premiums for coverage that is highly profitable and then those big profits revert right back to the banks through reinsurance agreements.
>
> \* \* \* \*
>
> In sum, when you combine this close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions that we need to explore in these hearings.

*Id.* at page 3.

11.     These 2012 hearings investigated the FPI practices of banks, mortgage loan servicers, and insurance providers. *See Under Interrogation*, Am. Banker (Jan. 27, 2012, 5:03pm ET), http://www.americanbanker.com/news/force-placed-insurance-subpoenas-1046159-1.html.

12.     Consumer advocates at these hearings stated that force-placed insurance usually costs the borrower more than the price of regular insurance, and Mr. Lawsky noted that insurers paid an exceptionally low loss ratio of around less than 25 cents in claims for every dollar of premium they received. *See* Mary Williams Walsh, *New York Investigates Insurer Payments to Banks*, N.Y. Times (May 21, 2012), http://www.nytimes.com/2012/05/22/business/new-york-investigates-home-insurer-payments-to-banks.html;

13.     In response to these hearings, New York Governor Andrew M. Cuomo stated that his administration would continue to investigate the "lack of competition, high prices, and low

loss ratios and take necessary steps to clean up this market." *Id.*

14.     In addition, the National Association of Insurance Commissioners ("NAIC") – the lead national insurance regulatory organization created and governed by the chief insurance regulators from all 50 states that is charged with establishing standards and best practices, conducting peer reviews, and coordinating regulatory oversight – began investigating force-placed insurance practices and held public hearings on August 9, 2012 to look into the force-placed insurance practices of banks, insurers and their partners. *See* Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules*, PropertyCasualty360.com/2012/08/10/naic-promises-greater-focus-on-forc-placed-insura (Aug. 10, 2012).

15.     Throughout the Class Period (defined below), Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including: (a) improperly exploiting the ability to manage and gain access to lines of credit and/or escrow accounts in order to exact payment for inflated force-placed insurance premiums that included unlawful kickbacks; (b) forcing insurance on borrowers arranged through pre-designated providers of force-placed insurance at a substantially higher cost to the borrower; (c) charging Plaintiff and members of the Class amounts for force-placed insurance, which were inflated by unreasonable expenses unrelated to the provision of the insurance and that result from collusion among affiliates and/or providers involved in the process; (d) receiving fees, payments, commissions and other things of value from providers of force-placed insurance; (e) misrepresenting that Standard Mortgage was force-placing insurance on Plaintiff's and Class members' properties to secure Standard Mortgage's interests, and omitting to inform Plaintiff and Class members that Standard Mortgage was force-placing insurance to generate an

unreasonable and unwarranted profit for Standard Mortgage and SM Insurance; and (f) conspiring to take advantage of their contractual authority to force-place insurance on Plaintiff and the Class members in order to return an undisclosed and improper financial benefit to Defendants.

16.     Based on Defendants' conduct as described herein, Plaintiff asserts claims for (a) violating the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961-1968 ("RICO"); (b) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (c) Breach of the Duty of Good Faith and Fair Dealing against Standard Mortgage; (d) Unjust Enrichment against Standard Mortgage; and (e) Unjust Enrichment against SM Insurance.

17.     Plaintiff and the Class seek injunctive relief, corresponding declaratory relief, monetary relief, treble damages under RICO, and other appropriate relief for Defendants' unlawful conduct, as described herein.

## THE PARTIES

**A.     Plaintiff**

18.     Plaintiff Jordella Robinson resides in Harvey, Louisiana and is a member of the Class.

19.     Plaintiff purchased her home in Harvey, Louisiana with a loan that is now owned or serviced through Standard Mortgage and/or its affiliated entities.

20.     Plaintiff was force-placed with insurance by Defendants as alleged below.

**B.     Standard Mortgage**

21.     Defendant Standard Mortgage is a Louisiana corporation with its headquarters at 701 Poydras Street, Suite 400, New Orleans, Louisiana.

22.     Standard Mortgage operates throughout the country, including in this District.

23.     At all relevant times, Standard Mortgage was the lender and/or servicer on Plaintiff's mortgage.

24.     Standard Mortgage force placed insurance on Plaintiff and her property as alleged below.

**C.     <u>SM Insurance</u>**

25.     Defendant SM Insurance is a Louisiana corporation with its principal place of business at 701 Poydras Street, Suite 400 Plaza, New Orleans, Louisiana. It does business nationwide, including in this District.

26.     SM Insurance was the insurer on the policies that Standard Mortgage force-placed on Plaintiff.

**JURISDICTION AND VENUE**

27.     This Court has federal question jurisdiction over Plaintiff's RICO claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

28.     Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

29.     Alternatively, this Court has personal jurisdiction over Defendants because Defendants are engaged in systematic and continuous business activities in Louisiana, have sufficient minimum contacts in Louisiana, and/or otherwise intentionally avail themselves of the

Louisiana consumer market. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants appropriate under traditional notions of fair play and substantial justice.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff resides in this District, the property on which Defendants force-placed insurance is in this District, Defendants regularly conduct business in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

A.     <u>**Background**</u>

31.     As is typical of mortgagees, Standard Mortgage requires borrowers to purchase and agree to maintain insurance coverage on their secured property.

32.     To ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain the insurance. The amounts disbursed for the procurement of such insurance becomes additional debt secured by the mortgage.

33.     Plaintiff's and Class members' mortgage agreements do not disclose that Standard Mortgage has an exclusive arrangement with SM Insurance to manipulate the force-placed insurance market and artificially inflate the premiums that SM Insurance and Standard Mortgage charge to borrowers for force-placed insurance. The mortgage agreements do not disclose that the premiums are inflated to provide kickbacks and other financial benefits to Standard Mortgage and its affiliates, often disguised as commissions or reimbursement of expenses, and to cover the cost of discounted services, or to provide Standard Mortgage with lucrative reinsurance arrangements and to include unwarranted charges. The mortgage agreements do not disclose that

this payment will be based upon a percentage of the cost of the premium of the force-placed insurance.

34.     Force-placed insurance policies are almost always more expensive than standard insurance coverage, often by as much as ten times. While the force-placed insurance policy primarily benefits the lender, servicer and insurer, the excessive cost is passed on to the borrower. *See Jeff Horowitz, Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker, Nov. 10, 2010, 12:00 pm, available at

http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1.

**B.     Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

35.     Force-placed insurance programs have become a lucrative business for loan servicers and/or lenders such as Standard Mortgage. Commonly, the servicer and/or lender selects the provider through a pre-arranged agreement and force-places the policy in such a way as to receive improper financial benefits. The servicer and/or lender benefits by placing the policy either: (a) with an affiliate; or (b) with a third party provider who has already agreed to share revenue with the lender and/or servicer in the form of a direct commission payment, subsidized portfolio monitoring and/or through "reinsurance" premiums that are ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

36.     Under the direct payment arrangement, the provider of the force-placed insurance policy pays a portion of the premium collected either directly to the lender/servicer or to a subsidiary posing as an insurance "agent" in the form of commissions or as a "reimbursement" of the servicer's "incurred expenses" related to force-placing the insurance.

37.     Standard Mortgage had such an arrangement with SM Insurance.

38.     Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary's agreement to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.

39.     Illustrative of the typical kickback arrangements is the following graphic from American Banker:



40.     J. Robert Hunter of the Consumer Federation described these practices in his testimony before the NYSDFS:

> In some instances, lenders use [force-placed] insurance as a profit
> center by collecting commissions from insurers through lender-
> affiliated agents or brokers or by receiving below-cost or free
> services (such as tracking of loans) from insurers, and/or using
> "fronting" primary insurers to direct the coverage to lender-
> affiliated captive reinsurers. Lenders often receive free or below
> cost services from affiliated service providers.

41.     Another experienced and noted expert in the area of force-placed insurance, Birny

Birnbaum of the Center for Economic Justice, testified before the NYSDFS and stated that:

> Servicers have financial incentive to force-place the insurance
> because the premium includes commission and other consideration
> for the servicer. With some servicers, the insurance is reinsured
> through a captive reinsurer of the servicer, resulting in additional
> revenue to the servicer from the force-placement coverage.

42.     Borrowers have no say or input into the carrier or terms of the force-placed

insurance policies. The terms and conditions of the insurance policy, as well as the cost of the

policy, are determined by the servicer and the insurer, rather than negotiated between the

borrower and the insurer.

43.     For their part, servicers have no incentive to comparison shop for the best rate.

Rather, servicers are financially motivated to refer borrowers to the provider that will give the

best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums.

As the servicer's "commission" (*i.e.*, kickback) and/or reinsurance premium is usually related to

the size of the policy, the servicer actually has an incentive to purchase the highest priced

insurance, an interest diametrically opposed to that of the borrower.

44.     Commonly, a mortgage loan servicer enters into an agreement with an insurance

provider pursuant to which it refers borrowers exclusively to the provider for force-placed

insurance.

45.     Force-placed insurance policies are not underwritten on an individual policy

basis. Rather, servicers' contracts with force-placed insurance providers such as SM Insurance require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

46.     As J. Robert Hunter testified recently before the NYSDFS, "[the] lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."

47.     Lenders and servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider. The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.

48.     While mortgage servicers and lenders like Standard Mortgage profit greatly from force-placing insurance, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance. However, according to an article published by American Banker, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year." *See* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (Mar. 10, 2011, 12:25PM), available at http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html (noting that servicers demand generous commissions and other payments in return for their

referrals).

49.     "The incentives and potential for abuse in the administration of LPI [lender placed insurance] are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases; the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the servicer from the force-placement of the coverage." *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services ("Birnbaum House Testimony"), available at http://financialservices.house.gov/uploadedfiles/072811birnbaum.pdf.

50.     In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission – totaling hundreds of millions of dollars – out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral. The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance – so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance." *Id.*

51.     Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, this premise belies the fact that the profit margins generated by force-placed policies are unheard of elsewhere in the insurance industry.

52.     Lenders and servicers also attempt to blame the exorbitant cost of force-placed

insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.

53.     As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are unsupported by any evidence. Loss ratios have been historically low.

C.     **Defendants' Force-Placed Insurance Operations**

54.     Standard Mortgage was a party to an agreement with SM Insurance whereby Standard Mortgage received commissions or other financial benefits from SM Insurance for force placing insurance.

55.     In return, Standard Mortgage provided SM Insurance and its affiliates with the unfettered right to collect noncompetitive, inflated premiums from insurance policies force-placed throughout the United States.

56.     The excessively inflated price of force-placed insurance provided to Standard Mortgage borrowers did not represent the actual cost of providing the insurance but instead encompassed fees, commissions, rebates or kickbacks and other consideration for "faux" services purportedly provided by SM Insurance. The inflated price also consisted of a significant mark-up by SM Insurance, which took full advantage of distressed borrowers and the exclusive nature of its agreement with Standard Mortgage.

57.     Plaintiff's force-placed insurance cost more than equivalent, market-priced insurance.

58.     Defendants charged Plaintiff a premium of more than $8,000 when the premium for similar (although more comprehensive) coverage was approximately $2,000.

59.     The inflated, non-competitive portion of the force-placed insurance cost,

therefore, was split between Standard Mortgage and SM Insurance and damaged Plaintiff and the

Class.

**D.      The Origination of Plaintiff's Mortgage**

60.     In 2004, Plaintiff purchased a home located at 3844 Cimwood Drive, Harvey,

Louisiana (the "Property") and obtained a mortgage through Standard Mortgage to finance the

purchase.

61.     The terms of the Mortgage Agreement required the payment of certain insurance

charges, as detailed in paragraphs 4 and 7:

> **4. Fire, Flood, and Other Hazard Insurance.** Borrower shall
> insure all improvements on the Property, whether now in existence
> or subsequently erected, against any hazards, casualties, and
> contingencies, including fire. This insurance shall be maintained in
> the amounts and for the periods that Lender requires. Borrower
> shall also insure all improvements on the Property, whether now in
> existence or subsequently erected, against loss by floods to the
> extent required by the Secretary. All insurance shall be carried
> with companies approved by Lender. The insurance policies and
> any renewals shall be held by Lender and shall include loss
> payable clauses in favor of, and in a form acceptable to Lender.
>
> *            *            *
>
> **7. Charges to Borrower and Protection of Lender's Rights in
> the Property.** . . . If Borrower fails to make these payments or the
> payments required by paragraph 2, or fails to perform any other
> covenants and agreements contained in this Security Instrument, or
> there is a legal proceeding that may significantly affect Lender's
> rights in the Property (such as a proceeding in bankruptcy, for
> condemnation or to enforce laws or regulations), then Lender may
> do and pay whatever is necessary to protect the value of the
> Property and Lender's rights in the Property, including payment of
> taxes, hazard insurance and other items mentioned in Paragraph 2.
> Any amounts disbursed by Lender under this Paragraph shall
> become an additional debt of Borrower as provided for in the Loan
> Agreement and shall be secured by this Security Instrument. These
> amounts shall bear interest from the date of disbursement, at the

> Note rate, and at the option of Lender, shall be immediately due
> and payable.

*See* Mortgage, attached hereto as Exhibit 2 at pages 3 of 8 and 4 of 8.

62.     After Plaintiff closed on the loan, Standard Mortgage became the lender and servicer on Plaintiff's loan, subject to the terms in the Mortgage that Plaintiff had with Integra Bank.

**E.      Standard Mortgage Charged Plaintiff for Force-Placed Insurance Pursuant to Lucrative Pre-Arranged Agreements After Issuing Materially False and Misleading Notices**

63.     Before Defendants force-placed insurance on Plaintiff and her property, Plaintiff was paying an annual premium of approximately $2,000 per year for hazard insurance coverage.

64.     For example, for 2013 the premium for Plaintiff's own coverage was $2,283.00.

65.     By letter dated January 4, 2013, Standard Mortgage told Plaintiff that Standard Mortgage had force-placed insurance coverage on her property: "Our records indicate that you have not provided us with acceptable evidence of continuous homeowner's insurance coverage on the above property. In order to protect our mutual interests in the property, we have ordered coverage in accordance with the terms of your Deed of Trust/Mortgage. The insurance charges will be in the amount of $8,845.20." *See* Exhibit 3 attached.

66.     The premium for Defendants' force-placed coverage was four times the premium for Plaintiff's own coverage.

67.     The notice was objectively false and misleading because it failed to disclose, *inter alia*: (a) Standard Mortgage and its affiliates had preexisting agreements with SM Insurance that guaranteed Standard Mortgage would receive unearned, substantial kickbacks, financial benefits, a portion of the premium, and below market-cost portfolio monitoring; (b) that the "insurance charges" for the force-placed insurance were significantly higher because of an illicit *quid pro*

16

*quo* arrangement between and/or among Standard Mortgage and SM Insurance whereby Standard Mortgage received substantial kickbacks and other unearned consideration in return for giving SM Insurance and its affiliates the exclusive right to receive inflated, noncompetitive force-placed premiums on Standard Mortgage's entire loan portfolio; (c) the actual "insurance charges" were far less than the $8,845.20 set forth in the notice; (d) borrowers were also charged for the undisclosed "commission" received by Standard Mortgage from SM Insurance; (e) the notice made no reference to the kickbacks or commissions to Standard Mortgage for the force-placed insurance; (f) that Standard Mortgage would receive financial benefits and consideration as a result of the force-placement without earning any commission or income; and (g) that Standard Mortgage would violate the Mortgage's restriction on doing and paying only what was "necessary to protect the value of the Property and the Lender's rights in the Property." Mortgage ¶7.

68.     As a result of the additional charges by Defendants for the force-placed insurance coverage, Defendants charged Plaintiff's escrow account approximately $8,000.

69.     Defendants' notices and letters were materially misleading because the amounts charged to Plaintiff for the force-placed insurance were greater than the actual cost to insure the property (because it included amounts attributable to kickbacks in the form of commissions, illusory reinsurance, and/or below-cost outsourcing) and greater than the costs of insurance Standard Mortgage could have obtained elsewhere. The amounts charged were above the then-existing market rate.

70.     At no time did Defendants disclose to Plaintiff that the amounts they charged her covered kickbacks to Standard Mortgage, splitting of premiums by Standard Mortgage and SM Insurance, reinsurance profits, bundled administrative costs, below-cost services, or any of the

other impermissible charges described in this Complaint.

71.     Further, Standard Mortgage did not charge Plaintiff the "necessary" or actual "cost" of the policy as required by the Mortgage and the representations of Standard Mortgage; rather, the charges include illegal commissions, kickbacks, reinsurance profits, and profits from below cost services as described further in this Complaint. Additionally, the policy placed by Standard Mortgage on Plaintiff's property was substandard compared to those which Standard Mortgage could have obtained in the open market.

72.     Borrowers were also charged for the undisclosed "commission" received by Standard Mortgage and the notices made no reference to the arrangement between Standard Mortgage and SM Insurance for kickbacks, commissions and other benefits.

73.     Moreover, the notices were objectively false and misleading because they failed to disclose, *inter alia*: (1) Standard Mortgage and its affiliates had preexisting agreements with SM Insurance that guaranteed Standard Mortgage would receive unearned, substantial kickbacks and below market-cost portfolio monitoring and other benefits from SM Insurance; and (2) that the cost of force-placed insurance was "substantially more expensive" because of an illicit *quid pro quo* arrangement between Standard Mortgage and SM Insurance whereby Standard Mortgage received substantial financial benefits and other unearned consideration in return for giving SM Insurance the exclusive right to receive inflated, noncompetitive force-placed premiums on Standard Mortgage's entire loan portfolio.

74.     The amount listed as a premium in the escrow statements was materially false and misleading for the same reasons that the notices and letters were misleading and because the "annual premium amount" really was for more than just the premium and because:

> (a)     The notices and statements represented that borrowers were responsible for the cost of the coverage when, in actuality,

borrowers were also charged for the undisclosed "commission" and benefits received by Standard Mortgage;

(b)     The notices and statements failed to disclose that Standard Mortgage and its affiliates had preexisting agreements with SM Insurance that guaranteed Standard Mortgage would receive unearned financial benefits and below-market-cost portfolio monitoring;

(c)     The notices and statements failed to disclose that the cost of force-placed insurance was substantially more expensive because of an illicit *quid pro quo* arrangement between Standard Mortgage and SM Insurance whereby Standard Mortgage received unearned financial benefits and other unearned consideration in return for giving SM Insurance the exclusive right to receive inflated, noncompetitive force-placed premiums on Standard Mortgage's entire loan portfolio;

(d)     The notices and statements failed to disclose that the commissions or income paid to Standard Mortgage included portfolio-monitoring below-market cost and rebates or kickbacks and other financial benefits that were not in connection with any actual services rendered (and, thus, was not an earned commission but instead was a kickback).

## F.     Government Response to Mortgage Lender and Servicer Force-Placed Insurance Practices

75.     Force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed insurance following a lapse in their policies.

76.     State attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance. Recently, a coalition of forty-nine (49) state attorneys general entered into a historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See*

www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement); see also Jeff Horowitz, Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker (Mar. 10, 2011, 12:25 PM) (http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-034213-1.html).

77.     Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance. Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id.; see also Consent Judgment, United States of America v. Bank of America Corp.*, Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

78.     Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry – which also had a relatively low level of losses – as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See, e.g.*, Broderick Perkins, Title Insurance Industry in Hot Water with Regulators Again, SAN JOSE BUSINESS JOURNAL (May 22, 2005), available at http://www.bizjournals.com/sanjose/stores/2005/05/23/story4.html.

79.     Indeed, while announcing a $37.8 million settlement with nine title insurers, then Florida Insurance Commissioner John Garamendi stated, "This reinsurance scheme appears to be nothing more than a form of commercial bribery." As a result, a number of providers have

abandoned such arrangements altogether. *See* Press Release, Florida Department of Insurance (July 20, 2005), available at http://www.departmentofinsurance.ca.gov/0400-news/0100-press-releases/0080-2005/release069-05.cfm.

80.     Fannie Mae has changed its policies so as to curb bank and servicers' improper practices. Fannie Mae issued a Service Guide Announcement on March 14, 2012, "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements, and allowable reimbursable expenses for lender-placed insurance" for servicers of the loans it holds. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude: (1) any lender-placed insurance commission earned on that policy by the servicer or any related entity; (2) costs associated with insurance tracking or administration; (3) or any other costs beyond the actual cost of the lender-placed  insurance policy premium. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04, available at

https://www.fanniemae.com/content/announcement/svc1204.pdf.

81.     The New York State Department of Financial Services' hearings on force-placed insurance resulted in government action and findings that borrowers were over-charged for force-placed insurance. On June 12, 2012, Governor Cuomo's website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance." It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing. Also, DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down. In New York, two companies have 90 percent of the market. In addition, the hearings made clear that high force-placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*See* Governor Cuomo Announces DFS Action Could Save Some New York Homeowners Millions in Overcharges to Home Insurance, available at

http://www.governor.ny.gov/press/06122012DFS.

82.     The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is also unnecessary. For example, during 2009, one insurer collected approximately $2.7 billion of premiums through its specialty insurance division, which is overwhelmingly devoted to force-placed insurance. Notably, this insurer paid out only 36% of this amount in claims, though in the company's other lines of business a 70% claims-to-premiums ratio is the norm. Not surprisingly, far from being an excessive risk, force-placed insurance is actually this insurer's most profitable product.

83.     Birny Birnbaum, in his testimony before the New York Attorney General, presented statistics collected by the NAIC reflecting nationwide loss ratios for lender-placed insurance during the 2004-2011 period as being, on average, more than thirty-five points lower than the ratios for commercially available homeowners policies. See Birnbaum NYSDFS Testimony at 9, available at

http://www.dfs.ny.gov/about/hearings/fp_052012/Birny_Birnbaum_Center_for_Economic_Justice_testimony.pdf. When confined to the period from 2007-2011, the disparity between lender-placed insurance loss ratios and those of commercially available homeowners policies was nearly 42 points. *Id.*

## G.     Standard Mortgage's Force Placed Insurance Policies and Practices Provide Unearned and Unjustified Profits and Kickbacks to Defendants

84.     As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and

writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers, available at http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1. These costs are ultimately paid by the borrowers.

85.     Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher, implying paydays for servicers amounting to hundreds of millions of dollars per year.

86.     Moreover, the charges that Standard Mortgage chose to impose upon borrowers for force-placed insurance also unlawfully included the cost of portfolio monitoring and tracking services for Standard Mortgage's entire loan portfolio, the cost of which was then passed on to the small percentage of borrowers whose properties were force placed.

87.     Unjustified fees which amount to kickbacks also inflate the premiums of force placed insurance:

> The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policyholder's needs while seeking the most competitive price for the product. Such activities simply do not exist in [FPI] because there are only two national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two venders for proposals – and such activity is a rare event for most servicers.

Birnbaum NYSDFS Testimony at 18, available at

http://www.dfs.ny.gov/about/hearings/fp_052012/Birny_Birnbaum_Center_for_Economic_Justice_testimony.pdf.

88.     Standard Mortgage's practices of unlawfully profiting from force-placing

insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of these kickbacks – to the detriment of consumers.

89.     Standard Mortgage (through SM Insurance) has threatened and, indeed, stifled competition through this scheme. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Ties to Insurers, available at

http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff asserts her RICO claims on behalf of the following proposed nationwide Class:

> All persons who have or had a mortgage loan or line of credit
> owned, originated or serviced by Standard Mortgage and/or its
> affiliates secured by property located in United States and, in
> connection therewith, were charged for "force-placed" insurance
> on the secured property within the applicable statute of limitations.

91.     Plaintiff asserts her state law claims on behalf of the following proposed Louisiana sub-Class:

> All persons who have or had a mortgage loan or line of credit
> owned, originated or serviced by Standard Mortgage and/or its

affiliates secured by property located in Louisiana and, in
connection therewith, were charged for "force-placed" insurance
on the secured property within the applicable statute of limitations.

92.     These Classes exclude any judge or magistrate assigned to this case, Defendants,
and any entity in which any Defendant has a controlling interest, and Defendants' officers,
directors, legal representatives, successors, and assigns.

93.     <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is
impracticable. The Class includes likely thousands of Standard Mortgage's customers.

94.     <u>Typicality</u>: Plaintiff's claims are typical of the members of the proposed Class.

95.     <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class,
and has retained counsel experienced in complex class action litigation. Plaintiff has no interests
that are adverse to those of the Class that she seeks to represent.

96.     <u>Commonality</u>: Common questions of law and fact exist as to all members of the
Class and predominate over any questions solely affecting individual members of the Class,
including:

A.     Whether Defendants' form letters to borrowers materially misrepresent the
nature of force-placed insurance;

B.     Whether Standard Mortgage maintained a policy of referring force-placed
insurance business to insurers pursuant to pre-arranged agreements;

C.     Whether Standard Mortgage received commissions or any other payments or
things of value from SM Insurance and force-placed insurance providers;

D.     Whether Standard Mortgage participated in arrangements that involved
kickbacks;

E.     Whether Defendants received financial benefits from the force-placed
insurance providers in the form of insurance monitoring, tracking and
processing services;

F.     Whether Defendants received unauthorized and illicit payments in  connection
with force-placed insurance that were unrelated to a *bona fide* service in

connection with the force-placed insurance and its purpose;

G.    Whether Defendants received payments in connection with force-placed insurance that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

H.    Whether Standard Mortgage and SM Insurance devised a scheme to defraud borrowers and loan owners by charging them for force-placed insurance;

I.    Whether the scheme alleged herein constitutes mail or wire fraud;

J.    Whether Defendants have been unjustly enriched;

K.    Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages; and

L.    Whether Plaintiff and the Class are entitled to declaratory, injunctive, and  other equitable relief.

97.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

98.    Plaintiff is a member of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

99.    Class action status is warranted under Rule 23(b)(1)(A) because prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

100.    Class action status is also warranted under Rule 23(b)(1)(B) because prosecuting separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter,

be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

101.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

102.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

103.    Plaintiff reserves her right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

## COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

104.    Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

105.    Plaintiff, each Class member, and each Defendant, are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c)

### The Enterprise

106.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants, including their respective officers, directors, employees, agents and direct and indirect subsidiaries (

"Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

107.    The Enterprise was primarily managed by Standard Mortgage, which organized the fraudulent scheme and procured the involvement of SM Insurance.

108.    Alternatively, the Enterprise was managed by SM Insurance, which organized the fraudulent scheme and procured the involvement of Standard Mortgage.

109.    Each of the Defendants, however, agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent discretion.

110.    The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers and loan owners by overcharging them for force-placed insurance with respect to Standard Mortgage-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners of the loans to incur, overcharges in respect to such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, Standard Mortgage and SM Insurance, and their affiliates.

111.    The Enterprise operated from at least 2009 and its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

112.    Since at least 2009 Standard Mortgage has obtained force-placed insurance policies from SM Insurance for the loans Standard Mortgage services.

113.    Standard Mortgage hires SM Insurance as a subcontractor to perform Standard Mortgage's "insurance tracking" duties under Standard Mortgage's servicing agreements. Insurance tracking is a labor-intensive servicing responsibility related to force-placed insurance.

It consists of monitoring the status of homeowners' voluntary insurance to confirm that it is in force, notifying homeowners of any insurance deficiencies, and securing force-placed insurance when appropriate.

114.    This action is brought because Standard Mortgage, together with SM Insurance and its affiliates, devised and carried out a scheme to defraud borrowers and loan owners by overcharging them for force-placed insurance. Pursuant to the scheme, SM Insurance and its affiliates pay Standard Mortgage secret rebates, *i.e.*, kickbacks, camouflaged through complex transactions using affiliates and related parties. Standard Mortgage pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the force-placed insurance. In other words, the rebates reduce Standard Mortgage's force-placed insurance costs, but those savings are not passed through to borrowers. Because the amounts supposedly paid by Standard Mortgage for force-placed insurance constitute "servicing advances," loan owners bear the inflated charges through reduced loan proceeds and higher loss severities to the extent borrowers fail to pay.

115.    Any amounts paid by the servicer to buy force-placed insurance count as "servicing advances" under pooling and services agreement and other agreements between the servicer and the loan owner. The servicer is entitled to recoup such advances from the proceeds of the loan, whether through payments made by the borrower or, if the borrower defaults, through proceeds at foreclosure. Additionally, the servicer has the right to be reimbursed before any money is passed through to the securitization trust or other loan owner. In other words, the servicer gets paid "off the top." In this respect, servicers are functionally the senior-most creditors with respect to the loans they manage; their rights are senior even to those of the owners of the loans.

116.    As devised by Standard Mortgage and/or SM Insurance, the scheme involves the payment of rebates/kickbacks in at least two forms: (i) below-market tracking services and (ii) bogus "commissions."

117.    The below-market cost portfolio monitoring and tracking services are provided by SM Insurance. More specifically, the insurers and underwriters compensate SM Insurance for force-placing insurance, which includes compensation for its tracking services. Standard Mortgage pays only nominal consideration. The below market cost for tracking services constitutes rebates/kickbacks in kind.

118.    The bogus "commission" paid by SM Insurance to Standard Mortgage or to Standard Mortgage's affiliates is also a kickback. As with the tracking services, the money for the "commissions" is derived from the force-placed insurance premiums paid by Standard Mortgage. The "commission" payments are made on the pretense that a third-party insurance agent introduced the insurance customer, i.e., Standard Mortgage, to SM Insurance and its affiliates. At all relevant times, however, this pretense has been false.

119.    Standard Mortgage received the kickbacks from SM Insurance.

120.    Taxpayer-backstopped Government Sponsored Enterprises ("GSEs") Fannie Mae, Freddie Mac, and Ginnie Mae, which own and/or guarantee more than two-thirds of the loans serviced by Standard Mortgage, have also been grossly overcharged for force-placed insurance as a result of the scheme.

### The Pattern of Racketeering Activity

121.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this Complaint. The Defendants have

conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

122.    Standard Mortgage enters into servicing agreements with owners and/or holders of whole loans. The servicing agreements provide, *inter alia*, that Standard Mortgage is obligated to maintain continuous insurance on the secured properties.

123.    Standard Mortgage buys force-placed insurance from SM Insurance or its affiliates with respect to the loans Standard Mortgage services. Standard Mortgage pays insurance premiums to SM Insurance for the force-placed insurance.

124.    Standard Mortgage hires SM Insurance as a subcontractor to perform Standard Mortgage's "insurance tracking" responsibilities.

125.    Standard Mortgage and SM Insurance, and their affiliates conceal from the public, borrowers, and loan owners, that Standard Mortgage pays SM Insurance below market price for its insurance tracking services and that SM Insurance is also compensated by the insurance company and underwriters for these services.

126.    SM Insurance or its affiliates pay rebates or kickbacks to Standard Mortgage.

127.    The money to pay the rebates or kickbacks is derived from Standard Mortgage's force-placed insurance premiums. The amount of the rebates or kickbacks is computed as a percentage of Standard Mortgage's force-placed insurance premiums.

128.    The rebates and kickbacks are paid in the form of below-market cost tracking services and bogus "commissions."

129.    The bogus "commissions" are paid by SM Insurance to Standard Mortgage or an affiliate of Standard Mortgage on the false pretense that the affiliate is a third-party insurance agent. SM Insurance falsely labels these payments as "commissions."

130.     As a *quid pro quo* for the rebates and kickbacks, Standard Mortgage continues to procure force-placed insurance from SM Insurance or its affiliates for inflated, noncompetitive prices and continues to outsource insurance tracking to SM Insurance.

131.     Standard Mortgage retains the rebates/kickbacks for itself, while billing and charging borrowers based on the full purported price of the force-placed insurance. The rebates/kickbacks reduce Standard Mortgage's force-placed insurance costs, but those savings are not passed through to borrowers. Instead, borrowers are billed and charged the full purported price of the force-placed insurance even though that does not reflect the actual cost of the insurance policy.

132.     Additionally, when borrowers make their mortgage payments, Standard Mortgage subtracts the inflated amounts billed with respect to force-placed insurance off the top before applying any balance to principal, interest, or other charges.

133.     Because amounts paid for force-placed insurance are servicing advances, Standard Mortgage has inflated charges to borrowers by failing to pass through the rebates and kickbacks to borrowers. Standard Mortgage reimburses itself from the proceeds of the loans based on the inflated servicing advances. To the extent borrowers fail to pay, loan owners bear the inflated charges.

134.     SM Insurance computes the amounts purportedly due and issues notices to borrowers fraudulently setting forth the balances owed for force-placed insurance based on the full prices of the force-placed insurance premiums without subtracting the rebates and kickbacks.

135.     SM Insurance represents to consumers that notices are issued by Standard Mortgage.

136.     The notices and letters are on Standard Mortgage letterhead although SM

Insurance sends those letters and notices.

137.    Standard Mortgage approved and directed the issuance of the notices.

138.    The notices materially omit that Standard Mortgage is already reimbursed for a portion of the inflated premium by SM Insurance. By requiring borrowers to pay the full price of the inflated premium, Standard Mortgage gives itself a windfall.

139.    The notices are materially false by representing that borrowers are responsible for the cost of insurance when they actually are responsible for more than just the cost of the insurance. They are charged for the undisclosed "commission" that Standard Mortgage receives.

140.    To the extent that any notices that Defendants issue reveal that either Defendant will receive any kind of compensation in connection with the force-placed insurance, that statement was objectively false and misleading because it failed to disclose, *inter alia*: (1) Standard Mortgage "always" will receive compensation (instead of "may" receive compensation); (2) Standard Mortgage and its affiliates had preexisting agreements with SM Insurance that guaranteed that Standard Mortgage would receive a substantial rebate or kickback; (3) the compensation paid to Standard Mortgage, including below-market cost portfolio-monitoring and rebate/kickbacks, is not in connection any actual services rendered, and thus is not earned compensation but instead is a kickback; (4) under the agreements, Standard Mortgage was not compensated for the placement of the individual policies or certificates but rather was rebated or kicked-back money for agreeing to enter into exclusive force-placed insurance and outsourcing agreements with SM Insurance.

141.    The notices and statements lull borrowers into believing that no fraudulent scheme is occurring and that Standard Mortgage and SM Insurance and/or their affiliates are simply exercising Standard Mortgage's rights under borrowers' mortgage loan agreements. By

lulling Plaintiff and the Class into a false sense of security, the notices and statements make it less likely that borrowers will object to the improper charges, complain to the authorities, or bring lawsuits.

142.    Standard Mortgage issues remittance reports, monthly servicing reports, and annual certifications of compliance to loan owners that include information about Standard Mortgage's compensation, advances, and reimbursements. The reports and certifications fraudulently set forth balances for Standard Mortgage's advances and reimbursements based on the full prices of the force-placed insurance without subtracting the rebates and kickbacks. The reports and certifications also fraudulently exclude the compensation that Standard Mortgage derives from the kickbacks and rebates, which are not disclosed in the reports and certifications. Moreover, the reports and certifications fraudulently conceal that SM Insurance is not meaningfully compensated by Standard Mortgage from Standard Mortgage's own funds but, instead, through the force-placed insurance premiums, despite the fact that Standard Mortgage is thereby breaching its agreements with loan owners. The reports and certifications also omit that Standard Mortgage unjustly enriched itself by acting outside of its contractual authority within the mortgage loan agreements by billing borrowers for reimbursement of force-placed insurance costs in amounts in excess of Standard Mortgage's actual costs.

143.    The remittance reports, monthly servicing reports, and annual certifications of compliance lull loan owners into believing that no fraudulent scheme is occurring and that Defendants are simply exercising Standard Mortgage's rights under their servicing agreements. By lulling loan owners into a false sense of security, the remittance reports, monthly servicing reports, and annual certifications of compliance notices and statements make it less likely that loan owners will object to the improper charges, complain to the authorities, or bring lawsuits.

### The Predicate Acts of Mail and Wire Fraud

144.   The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, the Enterprise engaged in an intentional scheme or artifice to defraud borrowers and the owners of the loans serviced by Standard Mortgage and to obtain money or property from said borrowers and loan owners through false or fraudulent pretenses, representations and promises.

145.   The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of Standard Mortgage and SM Insurance and their affiliates in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

146.   It was reasonably foreseeable to Standard Mortgage and SM Insurance and their affiliates that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

147.   The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants. Nevertheless, Plaintiff can allege such transmissions generally.

148.   For the purpose of furthering and executing the scheme, Standard Mortgage and SM Insurance and their affiliates regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

(a)   SM Insurance issued materially false and misleading notices relating to

35

force-placed insurance to borrowers via mail;

> (b)  SM Insurance also communicated to borrowers with respect to force-placed insurance issues by telephone;

> (c)  Standard Mortgage issued monthly statements incorporating the falsely overstated force-placed insurance charges to borrowers via mail and/or wire;

> (d)  Standard Mortgage issued materially false and misleading remittance reports, monthly servicing reports and annual certifications of compliance to loan owners via the mail and/or electronically via wire;

> (e)  SM Insurance and/or Standard Mortgage received force-placed insurance payments from borrowers via mail and/or wire; and

> (f)  SM Insurance transmitted funds to Standard Mortgage's affiliates reflecting purported "commissions" via mail and/or wire.

149.    Standard Mortgage and SM Insurance and their affiliates utilized the mails and/or wires for the purpose of furthering and executing the scheme. As Standard Mortgage's insurance tracking subcontractor, SM Insurance drafts and issues standardized notices to borrowers.

150.    Prior to the placement of force-placed insurance, SM Insurance issues notices to borrowers demanding evidence of insurance and warning that Standard Mortgage will force place coverage if such evidence is not forthcoming. Once force-placed insurance is imposed, SM Insurance issues a letter (on Standard Mortgage letterhead) to inform borrowers that it has obtained coverage.

151.    These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Standard Mortgage, SM Insurance and their affiliates. Each electronic and/or postal transmission was incident to an essential part of

the scheme. As detailed above, Standard Mortgage, SM Insurance and their affiliates engaged in similar activities with respect to each member of the Class and with respect to the owners of the loans of each member of the Class.

152.    Each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

153.    Standard Mortgage, SM Insurance and their affiliates each participated in the scheme to defraud knowingly, willfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring falsely inflated, unauthorized charges in connection with force-placed insurance.

154.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur the falsely inflated, unauthorized charges with respect to force-placed insurance and thereby enable Standard Mortgage, SM Insurance and their affiliates to reap illicit profits.

155.    Standard Mortgage, SM Insurance and their affiliates were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and owners of the loans.

**Honest Services Fraud**

156.    The scheme alleged herein also constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

157.    The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

158.    The mail fraud statute reads in relevant part as follows:

Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

159.    The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

160.    18 U.S.C. § 1346 provides:

For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

161.    Through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

162.    In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks." *Id.* at 404. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.* at 365.

163.    At all relevant times, Standard Mortgage owed legal duties to render services to loan owners and borrowers. In all cases, those duties included maintaining continuous insurance coverage on the secured properties. The value of Standard Mortgage's services depended on

Standard Mortgage rendering those services in an honest manner. Nevertheless, Standard Mortgage misused its position as the servicer of the loans to extract bribes and kickbacks from SM Insurance. Standard Mortgage thereby breached its obligation to render "honest services" to loan owners and borrowers. Standard Mortgage and SM Insurance devised a scheme or artifice to defraud borrowers of their intangible right to Standard Mortgage's honest services through kickbacks.

**The Predicate Acts of Extortion,
Attempted Extortion,
<u>And Conspiracy to Commit Extortion</u>**

164.    The pattern of racketeering activity also consisted of extortion, attempted extortion, and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

165.    As alleged above, the mortgage loan agreements of Plaintiff and the Class authorize the lender to charge borrowers the costs of any insurance force-placed on their property. Nothing in the agreements authorizes the lender to charge any amount in excess of the lender's cost. Pursuant to the scheme alleged herein, however, Plaintiff and the Class were charged amounts in excess of Standard Mortgage's force-placed costs with respect to the borrowers' property. The rebates/kickbacks that Standard Mortgage received reduced such costs. Nevertheless, Standard Mortgage charged borrowers based on the full purported price of the force-placed insurance.

166.    At all relevant times, by virtue of the conduct alleged above, Standard Mortgage, SM Insurance and their affiliates induced, and attempted and conspired to induce, Plaintiff and the Class to pay these extra-contractual amounts, which were in excess of Standard Mortgage's force-placed insurance costs and not due under their respective mortgage loan agreements,

through the wrongful use of actual or threatened fear of economic harm. Specifically, Standard

Mortgage, SM Insurance and their affiliates used, and attempted and conspired to use, the actual

or threatened fear of default and foreclosure to induce Plaintiff and the Class to pay the improper

charges imposed.

167.    As alleged above, the mortgage loan agreements of Plaintiff and the Class entitled

Standard Mortgage to add any force-placed insurance charges to the balances of their loans and

to foreclose in order to collect such charges if unpaid. The mortgage loan agreements provide, in

words or substance, that any insurance charges "shall become an additional debt of Borrower and

be secured by this Security Instrument," Exhibit 2 (Mortgage) at ¶ 7, and that the lender or its

authorized servicer is entitled to foreclose to collect any unpaid amounts due.

168.    Mortgage loan servicers routinely collect unpaid force-placed insurance charges

through foreclosure. Superintendent Lawsky found that force-placed insurance charges

frequently "push distressed homeowners over the foreclosure cliff."

169.    By virtue of the facts alleged above, Plaintiff and the Class reasonably believed:

(i) that Standard Mortgage possessed the power to collect any unpaid force-placed insurance

charges through foreclosure; and (ii) that Standard Mortgage would exploit that power and

foreclose if borrowers failed to pay the insurance charges that Standard Mortgage and SM

Insurance imposed.

170.    Additionally, by virtue of the facts alleged above, Standard Mortgage, SM

Insurance and their affiliates agreed to engage in the acts alleged above, and intentionally

performed acts, including, without limitation, the acts alleged above, and under the

circumstances as Standard Mortgage, SM Insurance and their affiliates believed them to be,

constituted violations of the Hobbs Act and/or substantial steps in the commission of a Hobbs

Act violation. Moreover, Defendants and their affiliates thereby affected and intended to affect interstate commerce.

171.    Plaintiff and the Class received nothing of value in exchange for payment of the excess force-placed insurance charges.

## **Injury to Plaintiff and the Class**

172.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants and their affiliates, Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

173.    Plaintiff and the Class paid or were charged falsely inflated, unauthorized force-placed insurance premiums by reason, and as a direct, proximate and foreseeable result, of the scheme alleged. Moreover, the overcharging of Plaintiff and the Class for force-placed insurance was an integral and necessary part of the scheme, as those overcharges constituted purported "servicing advances" that Standard Mortgage was entitled to recoup "off the top" from the proceeds of the loans.

174.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

175.    SM Insurance is directly liable for its own violations of RICO, as alleged above.

176.    As alleged above, at all times relevant herein, when SM Insurance committed the RICO violations alleged herein, SM Insurance was acting within the course and scope of its authority as an authorized agent of Standard Mortgage and its affiliates.

**COUNT II**

**CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND
CORRUPT ORGANIZATION ACT, 18 U.S.C. § 1962(d)
(Against All Defendants)**

177.    Plaintiff repeats and realleges each and every paragraph above as if set forth

herein.

178.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to

conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

179.    As set forth in Count I, above, at all relevant times, Plaintiff and the Class were

"persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

180.    Defendants and their affiliates formed the previously alleged association-in-fact

Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently

overcharging borrowers and loan owners with respect to force-placed insurance. The purpose

thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated,

unauthorized charges with respect to force-placed insurance.

181.    The Enterprise was engaged in, and its activities affected interstate commerce

within the meaning of 18 U.S.C. § 1962(c).

182.    As set forth in Count I, above, Defendants and their affiliates conducted or

participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. §

1962(c).

183.    Defendants and their affiliates were each associated with the Enterprise and

agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate,

directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of

racketeering activity in violation of 18 U.S.C. § 1962(d).

184.    Defendants and their affiliates committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

185.    As a direct and proximate result of the overt acts and predicate acts of Defendants in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business and property in an amount to be determined at trial. Such injuries include, but are not limited to, fraudulently inflated charges with respect to force-placed insurance, as a direct, proximate and foreseeable result of the scheme alleged herein.

186.    Under the provisions of 18 U. S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

187.    Standard Mortgage and SM Insurance are directly liable for their own RICO conspiracy violations, as alleged above. Standard Mortgage and SM Insurance are also liable for the RICO conspiracy violations of each other as well as for the RICO conspiracy violations of their agents. As alleged above, pursuant to the scheme, Standard Mortgage engaged SM Insurance to provide Standard Mortgage with tracking services. At all times relevant herein, when SM Insurance committed the RICO conspiracy violations alleged herein, SM Insurance was acting within the course and scope of its authority as an authorized agent of Standard Mortgage.

## COUNT III

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against STANDARD MORTGAGE)

188.  Plaintiff incorporates by reference the allegations in the preceding paragraphs.

189.  A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

190.  Where an agreement affords one party the power to make discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

191.  Plaintiff and the Class members' mortgage contracts allow Standard Mortgage to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for need to fix formatting selecting an insurer or procuring an insurance policy.

192.  Standard Mortgage is afforded substantial discretion in force-placing insurance coverage. It is permitted to unilaterally choose the company from which it purchases force-placed insurance and negotiate any price for the coverage it procures. Standard Mortgage has an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith. Plaintiff does not seek to vary the express terms of the mortgage contract, but only to insure that Standard Mortgage exercise its discretion in good faith.

193.  Standard Mortgage breached the implied covenant of good faith and fair dealing by, among other things:

(a) Manipulating the force-placed insurance market by selecting insurers (here, SM Insurance) with inflated premiums that include kickbacks to Standard Mortgage and issuing excess insurance coverage not necessary to cover Standard Mortgage's risk, and by failing to seek                              competitive bids on the open market                              and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from SM Insurance without seeking a competitive price;

(b) Exercising its discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance policies with artificially inflated premiums to maximize its own profits;

(c) Assessing inflated, duplicative, and unnecessary amounts for force-placed insurance against Plaintiff and the Class and misrepresenting the reason for the cost of the policies;

(d) Allowing Standard Mortgage and its affiliates to collect a percentage of the amounts charged to Plaintiff and the Class as a kickback and passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e) Charging Plaintiff and the Class for commissions when the insurance is prearranged and no commission is due;

(f) Charging Plaintiff and the Class the cost of having the vendor perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiff or the Class;

(g) Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(h) Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan; and

(i) Charging Plaintiff and the Class an inflated premium due to the captive reinsurance arrangement.

194.   As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

## COUNT IV
## UNJUST ENRICHMENT/DISGORGEMENT
### (against Standard Mortgage)

195.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

196.     Standard Mortgage has been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct. The kickbacks, commissions and other compensation that Standard Mortgage received in connection with force-placed insurance were not legitimately earned, and came at the ultimate expense of its customers who had insurance force-placed on them.

197.     Standard Mortgage accepted and retained these payments under such circumstances that it would be inequitable for Standard Mortgage to retain the benefit without payment to Plaintiff and the other Class members.

198.     Plaintiff and the Class members have conferred a substantial benefit upon Standard Mortgage from the force-placed insurance premiums paid by Plaintiff and the Class members.

199.     As a result of Standard Mortgage's unjust enrichment, Plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek a full disgorgement and restitution of Standard Mortgage's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above and throughout the Complaint.

## COUNT V

## UNJUST ENRICHMENT
### (against SM Insurance)

200.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

201.     SM Insurance has been unjustly enriched as a result of the conduct described in

this Complaint and other inequitable conduct.

202.    SM Insurance gave Standard Mortgage, either directly or through an affiliate, a kickback disguised as a legitimate commission, but Standard Mortgage did not provide any services that entitled it to a commission.

203.    SM Insurance came to an agreement with Standard Mortgage and its affiliates to inflate premium prices charged to borrowers so that it could kick back to Standard Mortgage a percentage of that money.

204.    As consideration for this agreement, SM Insurance became the exclusive insurer for Standard Mortgage borrowers who were force-placed.

205.    In addition to the benefit of not competing in the insurance market for policies, SM Insurance was able to charge more than the market price for an insurance policy. While SM Insurance kicked back a portion of this amount to Standard Mortgage and/or its affiliates, SM Insurance retained a substantial portion of these inflated premiums at the expense of Plaintiff and the Class.

206.    Plaintiff and the Class have thus conferred a substantial benefit upon SM Insurance.

207.    Under such circumstances, it would be inequitable for SM Insurance to retain these benefits without payment to Plaintiff and the other Class members.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

A.    Determining that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Designating Plaintiff as the Class representative;

C.    Designating Plaintiff's counsel as counsel for the Class;

D.     Issuing proper notice to the Class at Defendants' expense;

E.     Declaring that Defendants' conduct violated RICO;

F.     Declaring that Standard Mortgage's conduct as alleged herein violated Standard Mortgage's duty of good faith and fair dealing;

G.     Declaring that Defendants' conduct as alleged herein was inequitable and that Defendants were unjustly enriched by their conduct;

H.     Declaring that Defendants acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiff and the Class as alleged herein;

I.     Awarding appropriate equitable relief, including restitution and an injunction requiring Defendants to reverse all unlawful, unfair, or otherwise improper charges for insurance coverage, allowing customers to close loans without first paying premiums for insurance that were not necessary or required by law, prohibiting Defendants from imposing unfair and unlawful insurance requirements on borrowers, prohibiting Defendants from earning commissions or other compensation for themselves or affiliated entities on force-placed insurance policies, and requiring Defendants to cease and desist from engaging in further unlawful conduct in the future;

J.     Awarding actual damages, treble damages, punitive damages, and interest;

K.     Awarding reasonable attorneys' fees and costs to the full extent permitted by law; and

L.     Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

Dated: September 3, 2015                    Respectfully submitted,

                                            JERNIGAN LAW FIRM


                                            By: _/s/Susanne Weiner Jernigan_____
                                            Susanne Weiner Jernigan LSBA # 14522
                                            829 Baronne Street
                                            New Orleans, LA 70113
                                            Tel: (504) 581-9322
                                            Fax: (866) 703-7621
                                            Email: sue@thejerniganfirm.com

Stephen J. Fearon, Jr. (*pro hac vice* pending)
**SQUITIERI & FEARON, LLP**
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553
Email: stephen@sfclasslaw.com

THE LAW OFFICES OF RONALD L. WILSON
Ronald L. Wilson LSBA # 13575
701 Poydras Street, Suite 4100
New Orleans, LA 70139
Tel: (504)-525-4361
Fax: (504) 525-4380
Email: cabral2@aol.com

*Counsel for Plaintiff and the Proposed Class*

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class

demand a trial by jury.

By: _____

Susanne Weiner  Jernigan