## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Jordella Robinson, individually and as a representative of a class of similarly situated borrowers, | |
| | Civil Action No. 2:15-cv-04123 |
| **Plaintiff,** | Division: "C-2" |
| v. | District Judge: Hon. Helen G. Berrigan |
| Standard Mortgage Corporation and Standard Mortgage Insurance Agency, Inc., | |
| | Magistrate Judge: Hon. Joseph C. Wilkinson, Jr. |
| **Defendants.** | |

## <u>AMENDED COMPLAINT-CLASS ACTION AND DEMAND FOR JURY TRIAL</u>

Plaintiff Jordella Robinson, on behalf of herself and as a representative of a class of similarly situated borrowers, brings the claims set forth below against Standard Mortgage Corporation ("Standard Mortgage") and Standard Mortgage Insurance Agency, Inc. ("SM Insurance") (collectively, "Defendants").

## NATURE OF THE ACTION

1.      Plaintiff and members of the Class (as defined below) have or had loans or lines of credit owned, originated, and/or serviced by Standard Mortgage secured by their property and were charged for "force-placed" insurance pursuant to exclusive agreements between Standard Mortgage and SM Insurance that returned significant  financial benefits to Standard Mortgage unrelated to any contractual or other *bona fide* interest in protecting Standard Mortgage's interest in the loan or the property, resulting in unauthorized and unfairly inflated costs to borrowers in violation of the law and the underlying mortgages.

2.      Throughout the proposed Class Period (defined below) Standard Mortgage would

replace borrowers lapsed insurance policies with "force-placed" or "lender-placed" insurance and would "force-place" duplicative and unnecessary insurance on borrowers. Such policies offer less coverage, are substantially more expensive, and provide lucrative financial benefits to Standard Mortgage and SM Insurance.

3.      Standard Mortgage exploited its contractual authority to force-place insurance in order to reap additional profits in the form of unjustified commissions and other forms of consideration at the expense of borrowers whose insurance was force-placed. Sometimes the consideration was disguised as reimbursements for certain costs or was a percentage of the force-placed premiums, subsidized or discounted administrative services, or lucrative captive reinsurance deals. These improper benefits were not legitimately related to the cost of the force-placed insurance or the purposes for which force-placed insurance is purchased – to protect the lender's interest in the mortgaged property.

4.      Standard Mortgage charges borrowers for the "cost" of procuring force-placed insurance but a portion of this purported "cost" is returned, transferred or paid back to Standard Mortgage and/or its affiliated entities.

5.      SM Insurance also benefitted financially from the force placed insurance practices at issue in this Complaint.

6.      Among other things, Plaintiff and members of the Class seek to recover treble damages under RICO, or, in the alternative, damages equal to the amount of the improper and inequitable financial benefit received by Defendants and/or their affiliates as a result of this anti-consumer and predatory practice.

7.      The premiums paid by and/or assessed to Plaintiff and members of the Class also included amounts not attributable to the cost of providing force-placed insurance but, instead,

2

constituted expenses associated with servicing the loans. The percentage of borrowers who were charged for force-placed insurance were shouldering the costs of monitoring Standard Mortgage's entire loan portfolio – effectively providing kickbacks to Standard Mortgage in the form of below-market, outsourced insurance services.

8.      Plaintiff and the Class were charged substantially more than the price of regular insurance by Defendants. These charges included large commissions being paid from SM Insurance to Standard Mortgage while SM Insurance benefited from an exceptionally low loss ratio compared to the home insurance industry at large.

9.      Throughout the Class Period (defined below), Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including: (a) improperly exploiting the ability to manage and gain access to lines of credit and/or escrow accounts in order to exact payment for inflated force-placed insurance premiums that included unlawful kickbacks; (b) forcing insurance on borrowers arranged through pre-designated providers of force-placed insurance at a substantially higher cost to the borrower; (c) charging Plaintiff and members of the Class amounts for force-placed insurance, which were inflated by unreasonable expenses unrelated to the provision of the insurance and that result from collusion among affiliates and/or providers involved in the process; (d) receiving fees, payments, commissions and other things of value from providers of force-placed insurance; (e) misrepresenting that Standard Mortgage was force-placing insurance on Plaintiff's and Class members' properties to secure Standard Mortgage's interests, and omitting to inform Plaintiff and Class members that Standard Mortgage was force-placing insurance to generate an unreasonable and unwarranted profit for Standard Mortgage and SM Insurance; and (f) conspiring to take advantage of their contractual authority to force-place insurance on Plaintiff

and the Class members in order to return an undisclosed and improper financial benefit to Defendants.

10.     Based on Defendants' conduct as described herein, Plaintiff asserts claims for (a) violating the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961-1968 ("RICO"); (b) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (c) Breach of the Duty of Good Faith and Fair Dealing against Standard Mortgage; (d) Unjust Enrichment against Standard Mortgage; and (e) Unjust Enrichment against SM Insurance.

11.     Plaintiff and the Class seek injunctive relief, corresponding declaratory relief, monetary relief, treble damages under RICO, and other appropriate relief for Defendants' unlawful conduct, as described herein.

## THE PARTIES

### A.     Plaintiff

12.     Plaintiff Jordella Robinson resides in Harvey, Louisiana and is a member of the Class.

13.     Plaintiff purchased her home in Harvey, Louisiana with a loan that is now owned or serviced through Standard Mortgage and/or its affiliated entities.

14.     Plaintiff was force-placed with insurance by Defendants as alleged below.

### B.     Standard Mortgage

15.     Defendant Standard Mortgage is a Louisiana corporation with its headquarters at 701 Poydras Street, Suite 400, New Orleans, Louisiana.

16.     Standard Mortgage operates throughout the country, including in this District.

17.     At all relevant times, Standard Mortgage was the lender and/or servicer on Plaintiff's mortgage.

4

18.     Standard Mortgage force placed insurance on Plaintiff and her property as alleged below.

C.     **SM Insurance**

19.     Defendant SM Insurance is a Louisiana corporation with its principal place of business at 701 Poydras Street, Suite 400 Plaza, New Orleans, Louisiana. It does business nationwide, including in this District.

20.     SM Insurance was the insurer on the policies that Standard Mortgage force-placed on Plaintiff.

## JURISDICTION AND VENUE

21.     This Court has federal question jurisdiction over Plaintiff's RICO claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22.     Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

23.     Alternatively, this Court has personal jurisdiction over Defendants because Defendants are engaged in systematic and continuous business activities in Louisiana, have sufficient minimum contacts in Louisiana, and/or otherwise intentionally avail themselves of the Louisiana consumer market. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants appropriate under traditional notions of fair play and substantial

justice.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff resides in this District, the property on which Defendants force-placed insurance is in this District, Defendants regularly conduct business in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

A.     **Background**

25.     As is typical of mortgagees, Standard Mortgage requires borrowers to purchase and agree to maintain insurance coverage on their secured property.

26.     To ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain the insurance. The amounts disbursed for the procurement of such insurance becomes additional debt secured by the mortgage.

27.     Plaintiff's and Class members' mortgage agreements do not disclose that Standard Mortgage has an exclusive arrangement with SM Insurance to manipulate the force-placed insurance market and artificially inflate the premiums that SM Insurance and Standard Mortgage charge to borrowers for force-placed insurance. The mortgage agreements do not disclose that the premiums are inflated to provide kickbacks and other financial benefits to Standard Mortgage and its affiliates, often disguised as commissions or reimbursement of expenses, and to cover the cost of discounted services, or to provide Standard Mortgage with lucrative reinsurance arrangements and to include unwarranted charges. The mortgage agreements do not disclose that this payment will be based upon a percentage of the cost of the premium of the force-placed insurance.

28.    The insurance policies Standard Mortgage force-placed on Plaintiff's and the Class's homes were significantly more expensive than standard insurance coverage. While the force-placed insurance policy primarily benefits Standard Mortgage, the excessive cost is passed on to Plaintiff and the Class.

**B.    Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

29.    Force-placed insurance programs have become a lucrative business for loan servicers and/or lenders such as Standard Mortgage. Commonly, the servicer and/or lender selects the provider through a pre-arranged agreement and force-places the policy in such a way as to receive improper financial benefits. The servicer and/or lender benefits by placing the policy either: (a) with an affiliate; or (b) with a third party provider who has already agreed to share revenue with the lender and/or servicer in the form of a direct commission payment, subsidized portfolio monitoring and/or through "reinsurance" premiums that are ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

30.    Under the direct payment arrangement, the provider of the force-placed insurance policy pays a portion of the premium collected either directly to the lender/servicer or to a subsidiary posing as an insurance "agent" in the form of commissions or as a "reimbursement" of the servicer's "incurred expenses" related to force-placing the insurance.

31.    Standard Mortgage had such an arrangement with SM Insurance.

32.    Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary's agreement to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums

7

received on account of the policy.

33.     Defendants' kickback arrangement mirrored the typical kickback arrangement of other mortgage servicers. Illustrative of the typical kickback arrangements is the following graphic from American Banker:

## Sharing in the Profits

How servicers make money arranging force-placed coverage

| Commissions | Reinsurance |
| --- | --- |
| To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer | To replace lapsed coverage, servicer buys policy on home from insurer |
| Servicer advances premiums to insurer | Servicer advances premiums to insurer |
| Insurer pays portion of premium back to subsidiary as a commission | Subsidiary of servicer reinsures part of the policy, gets a cut of premiums |
| Servicer bills borrower for the policy | If necessary, subsidiary buys letter of credit from another party |
| If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale | Servicer bills borrower for the policy |
| | If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale |





34.     Standard Mortgage used force-placed insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or brokers or by receiving below-cost or free services (such as tracking of loans) from insurers.

35.     Standard Mortgage had a financial incentive to force-place insurance because the "premium" included unearned commissions and other unearned consideration.

36.     Borrowers have no say or input into the carrier or terms of the force-placed

insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

37.     For their part, servicers have no incentive to comparison shop for the best rate. Rather, servicers are financially motivated to refer borrowers to the provider that will give the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums. As the servicer's "commission" (*i.e.*, kickback) and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to purchase the highest priced insurance, an interest diametrically opposed to that of the borrower.

38.     Commonly, a mortgage loan servicer enters into an agreement with an insurance provider pursuant to which it refers borrowers exclusively to the provider for force-placed insurance.

39.     Force-placed insurance policies are not underwritten on an individual policy basis. Rather, servicers' contracts with force-placed insurance providers such as SM Insurance require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

40.     The lack of underwriting should have resulted in much lower acquisition expenses for SM Insurance, since no sales force is required to place the insurance. Nevertheless, SM Insurance's force-placed insurance was significantly more costly than borrower-obtained insurance.

41.     Lenders and servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider. The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property.

In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.

42.     Plaintiff and the Class did not request the insurance they received, but were charged for it nevertheless. The cost of the force-placed insurance charged to Plaintiff and the Class was much higher than a policy the borrower would purchase on his or her own. Standard Mortgage had an incentive to force-placed insurance because the "premiums" charged included unearned commissions to Standard Mortgage and, in some cases, the insurance was reinsured through a captive reinsurer of Standard Mortgage, resulting in additional unearned revenue to Standard Mortgage.

43.     In addition, the loss ratio for SM Insurance on Standard Mortgage's force-placed insurance portfolio was extremely low—making it extremely profitable. SM Insurance passed along the benefits to Standard Mortgage who received unearned commissions and passed along the cost of tracking all of its loans on only those who were charged for force-placed insurance.

44.     Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, this premise belies the fact that the profit margins generated by force-placed policies are unheard of elsewhere in the insurance industry.

45.     Lenders and servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter,

10

insurers do not routinely inspect residential properties in the course of underwriting.

46.     Standard Mortgage's explanations for the high cost of insurance are unsupported by any evidence and SM Insurance's loss ratios for force-placed insurance have been significantly lower than regular insurance.

**C.     Defendants' Force-Placed Insurance Operations**

47.     Standard Mortgage was a party to an agreement with SM Insurance whereby Standard Mortgage received commissions or other financial benefits from SM Insurance for force placing insurance.

48.     In return, Standard Mortgage provided SM Insurance and its affiliates with the unfettered right to collect noncompetitive, inflated premiums from insurance policies force-placed throughout the United States.

49.     The excessively inflated price of force-placed insurance provided to Standard Mortgage borrowers did not represent the actual cost of providing the insurance but instead encompassed fees, commissions, rebates or kickbacks and other consideration for "faux" services purportedly provided by SM Insurance. The inflated price also consisted of a significant mark-up by SM Insurance, which took full advantage of distressed borrowers and the exclusive nature of its agreement with Standard Mortgage.

50.     Plaintiff's force-placed insurance cost more than equivalent, market-priced insurance.

51.     Defendants charged Plaintiff a premium of more than $8,000 when the premium for similar (although more comprehensive) coverage was approximately $2,000.

52.     The inflated, non-competitive portion of the force-placed insurance cost, therefore, was split between Standard Mortgage and SM Insurance and damaged Plaintiff and the

11

Class.

D.    **The Origination of Plaintiff's Mortgage**

53.    In 2004, Plaintiff purchased a home located at 3844 Cimwood Drive, Harvey, Louisiana (the "Property") and obtained a mortgage through Standard Mortgage to finance the purchase.

54.    The terms of the Mortgage Agreement required the payment of certain insurance charges, as detailed in paragraphs 4 and 7:

> **4. Fire, Flood, and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to Lender.
>
> \*        \*        \*
>
> **7. Charges to Borrower and Protection of Lender's Rights in the Property.** . . . If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

*See* Mortgage, attached hereto as Exhibit 1 at pages 3 of 8 and 4 of 8.

12

55.     After Plaintiff closed on the loan, Standard Mortgage became the lender and servicer on Plaintiff's loan, subject to the terms in the Mortgage that Plaintiff had with Integra Bank.

**E.     Standard Mortgage Charged Plaintiff for Force-Placed Insurance Pursuant to Lucrative Pre-Arranged Agreements After Issuing Materially False and Misleading Notices**

56.     Before Defendants force-placed insurance on Plaintiff and her property, Plaintiff was paying an annual premium of approximately $2,000 per year for hazard insurance coverage.

57.     For example, for 2013 the premium for Plaintiff's own coverage was $2,283.00.

58.     On September 7, 2012, Standard Mortgage sent Plaintiff a letter stating that it would force place insurance on her home. It stated that "[b]ecause we will not have all of the information that you would normally provide when purchasing coverage directly, the rate of coverage we acquire may be higher than what you might otherwise be able to obtain. The premium will be $8,820.00."

59.     This letter is false and misleading because the reason the premium was nearly four times the cost of Plaintiff's own insurance policy was because the cost of the large kickback to Standard Mortgage was figured into the cost of the insurance "premium".

60.     Standard Mortgage sent Plaintiff another letter on October 26, 2012, stating verbatim the same false reason for the insurance premium's high cost.

61.     On November 24, 2012, Standard Mortgage sent Plaintiff a letter stating that "the premium of $8,845.20 will be billed to your account and your monthly payment will be increased."

62.     This statement falsely represents that the cost of the insurance policy premium is $8,845.20, when the true cost of insurance was much less. The "premium" Standard Mortgage

claims was $8,845.20 included the true cost of insurance plus a substantial and undisclosed kickback to Standard Mortgage.

63.     By letter dated January 4, 2013, Standard Mortgage told Plaintiff that Standard Mortgage had force-placed insurance coverage on her property: "Our records indicate that you have not provided us with acceptable evidence of continuous homeowner's insurance coverage on the above property. In order to protect our mutual interests in the property, we have ordered coverage in accordance with the terms of your Deed of Trust/Mortgage. The insurance charges will be in the amount of $8,845.20." *See* Exhibit 2 attached.

64.     The premium for Defendants' force-placed coverage was four times the premium for Plaintiff's own coverage.

65.     The notices were objectively false and misleading because they failed to disclose, *inter alia*: (a) Standard Mortgage had preexisting agreements with SM Insurance that guaranteed Standard Mortgage would receive unearned, substantial kickbacks, financial benefits, a portion of the premium, and below market-cost portfolio monitoring; (b) that the "insurance charges" for the force-placed insurance were significantly higher because of an illicit *quid pro quo* arrangement between and/or among Standard Mortgage and SM Insurance whereby Standard Mortgage received substantial kickbacks and other unearned consideration in return for giving SM Insurance and its affiliates the exclusive right to receive inflated, noncompetitive force-placed premiums on Standard Mortgage's entire loan portfolio; (c) the cost of force-placed insurance was "substantially more expensive" because of an illicit *quid pro quo* arrangement between Standard Mortgage and SM Insurance whereby Standard Mortgage received substantial financial benefits and other unearned consideration in return for giving SM Insurance the exclusive right to receive inflated, noncompetitive force-placed premiums on Standard

14

Mortgage's entire loan portfolio; (d) the actual "insurance charges" were far less than the $8,845.20 set forth in the notice; (e) borrowers were also charged for the undisclosed "commission" received by Standard Mortgage from SM Insurance; (f) the notice made no reference to the kickbacks or commissions to Standard Mortgage for the force-placed insurance; (g) that Standard Mortgage would receive financial benefits and consideration as a result of the force-placement without earning any commission or income; and (h) that Standard Mortgage would violate the Mortgage's restriction on doing and paying only what was "necessary to protect the value of the Property and the Lender's rights in the Property." Mortgage at ¶7.

66.     As a result of the additional charges by Defendants for the force-placed insurance coverage, Defendants charged Plaintiff's escrow account approximately $8,000.

67.     Defendants' notices and letters were materially misleading because the amounts charged to Plaintiff for the force-placed insurance were greater than the actual cost to insure the property (because it included amounts attributable to kickbacks in the form of commissions, illusory reinsurance, and/or below-cost outsourcing) and greater than the costs of insurance Standard Mortgage could have obtained elsewhere. The amounts charged were above the then-existing market rate.

68.     At no time did Defendants disclose to Plaintiff that the amounts they charged her covered kickbacks to Standard Mortgage, splitting of premiums by Standard Mortgage and SM Insurance, reinsurance profits, bundled administrative costs, below-cost services, or any of the other impermissible charges described in this Complaint.

69.     Further, Standard Mortgage did not charge Plaintiff the "necessary" or actual "cost" of the policy as required by the Mortgage and the representations of Standard Mortgage; rather, the charges include illegal commissions, kickbacks, reinsurance profits, and profits from

below cost services as described further in this Complaint. Additionally, the policy placed by Standard Mortgage on Plaintiff's property was substandard compared to those which Standard Mortgage could have obtained in the open market.

70.   Borrowers were also charged for the undisclosed commission received by Standard Mortgage and the notices made no reference to the arrangement between Standard Mortgage and SM Insurance for kickbacks, commissions and other benefits.

71.   Moreover, the notices and escrow statements were objectively false and misleading because the amount listed as an "annual premium amount" really was for more than just the premium and because:

(a)   The notices and statements represented that borrowers were responsible for the cost of the coverage when, in actuality, borrowers were also charged for the undisclosed "commission" and benefits received by Standard Mortgage;

(b)   The notices and statements failed to disclose that Standard Mortgage and its affiliates had preexisting agreements with SM Insurance that guaranteed Standard Mortgage would receive unearned financial benefits and below-market-cost portfolio monitoring;

(c)   The notices and statements failed to disclose that the cost of force-placed insurance was substantially more expensive because of an illicit *quid pro quo* arrangement between Standard Mortgage and SM Insurance whereby Standard Mortgage received unearned financial benefits and other unearned consideration in return for giving SM Insurance the exclusive right to receive inflated, noncompetitive force-placed premiums on Standard Mortgage's entire loan portfolio;

(d)   The notices and statements failed to disclose that the commissions or income paid to Standard Mortgage included portfolio-monitoring below-market cost and rebates or kickbacks and other financial benefits that were not in connection with any actual services rendered (and, thus, was not an earned commission but instead was a kickback).

16

**F.     Government Response to Mortgage Lender and Servicer Force-Placed Insurance Practices**

72.     Force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed insurance following a lapse in their policies.

73.     Fannie Mae has changed its policies so as to curb bank and servicers' improper practices. Fannie Mae issued a Service Guide Announcement on March 14, 2012, "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements, and allowable reimbursable expenses for lender-placed insurance" for servicers of the loans it holds. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude: (1) any lender-placed insurance commission earned on that policy by the servicer or any related entity; (2) costs associated with insurance tracking or administration; (3) or any other costs beyond the actual cost of the lender-placed insurance policy premium. *See* Fannie Mae Servicing Guide Announcement           SVC-2012-04,           available           at https://www.fanniemae.com/content/announcement/svc1204.pdf.

74.     The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is also unnecessary. Not surprisingly, far from being an excessive risk, force-placed insurance is actually SM Insurance's most profitable product.

**G.     Standard Mortgage's Force Placed Insurance Policies and Practices Provide Unearned and Unjustified Profits and Kickbacks to Defendants**

75.     While Standard Mortgage performed little to no work in the monitoring of its loan

17

portfolio for lapses and writing policies, it received unearned payments from SM Insurance nevertheless. These payments were simply a cost of doing force-placed business.

76.    Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher, implying paydays for servicers amounting to hundreds of millions of dollars per year.

77.    Moreover, the charges that Standard Mortgage chose to impose upon borrowers for force-placed insurance also unlawfully included the cost of portfolio monitoring and tracking services for Standard Mortgage's entire loan portfolio, the cost of which was then passed on to the small percentage of borrowers whose properties were force placed.

78.    The classic role of insurance producer is to help policyholders determine their needs and shop the market. Standard Mortgage, however, did not live up to this class role. Rather, Standard Mortgage force-placed borrowers with the extremely expensive policies due to Standard Mortgage's incentive to receive unearned commissions and receive below market rate portfolio monitoring.

79.    Standard Mortgage's practices of unlawfully profiting from force-placing insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of these kickbacks – to the detriment of consumers.

80.    Standard Mortgage (through SM Insurance) has threatened and, indeed, stifled

18

competition through this scheme. Standard Mortgage had no incentive to select competitively priced insurance policies. Instead, Standard Mortgage selected extremely expensive policies which only protected its own interest and which passed on unearned financial benefits to Standard Mortgage.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff asserts her RICO claims (Counts I and II) on behalf of the following proposed nationwide Class:

> All persons who have or had a mortgage loan or line of credit owned, originated or serviced by Standard Mortgage and/or its affiliates secured by property located in United States and, in connection therewith, were charged for "force-placed" insurance on the secured property within the applicable statute of limitations.

82.     Plaintiff asserts her state law claims (Counts III-V) on behalf of the following proposed Louisiana sub-Class:

> All persons who have or had a mortgage loan or line of credit owned, originated or serviced by Standard Mortgage and/or its affiliates secured by property located in Louisiana and, in connection therewith, were charged for "force-placed" insurance on the secured property within the applicable statute of limitations.

83.     These Classes exclude any judge or magistrate assigned to this case, Defendants, and any entity in which any Defendant has a controlling interest, and Defendants' officers, directors, legal representatives, successors, and assigns.

84.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Class includes likely thousands of Standard Mortgage's customers.

85.     Typicality: Plaintiff's claims are typical of the members of the proposed Class.

86.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class, and has retained counsel experienced in complex class action litigation. Plaintiff has no interests

19

that are adverse to those of the Class that she seeks to represent.

87.     Commonality: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

A.     Whether Defendants' form letters to borrowers materially misrepresent the nature of force-placed insurance;

B.     Whether Standard Mortgage maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

C.     Whether Standard Mortgage received commissions or any other payments or things of value from SM Insurance and force-placed insurance providers;

D.     Whether Standard Mortgage participated in arrangements that involved kickbacks;

E.     Whether Defendants received financial benefits from the force-placed insurance providers in the form of insurance monitoring, tracking and processing services;

F.     Whether Defendants received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to a *bona fide* service in connection with the force-placed insurance and its purpose;

G.     Whether Defendants received payments in connection with force-placed insurance that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

H.     Whether Standard Mortgage and SM Insurance devised a scheme to defraud borrowers and loan owners by charging them for force-placed insurance;

I.     Whether the scheme alleged herein constitutes mail or wire fraud;

J.     Whether Defendants have been unjustly enriched;

K.     Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages; and

L.     Whether Plaintiff and the Class are entitled to declaratory, injunctive, and other equitable relief.

88.     These and other questions of law and fact are common to the Class and

20

predominate over any questions affecting only individual members of the Class.

89.     Plaintiff is a member of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

90.     Class action status is warranted under Rule 23(b)(1)(A) because prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

91.     Class action status is also warranted under Rule 23(b)(1)(B) because prosecuting separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

92.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

93.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

94.     Plaintiff reserves her right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

## COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

95.     Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

96.     Plaintiff, each Class member, and each Defendant, are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

97.     The alleged unlawful conduct is in violation of 18 U.S.C. § 1962(c).

98.     **Each defendant and the alleged misconduct and basis of liability of each defendant.**

(a)     STANDARD MORTGAGE CORPORATION ("Standard Mortgage") is a Louisiana corporation with its headquarters in New Orleans, Louisiana. Standard Mortgage participated and conspired to participate in the predicate acts that form the pattern of racketeering alleged below.

(b)     STANDARD MORTGAGE INSURANCE AGENCY, INC. ("SM Insurance") is a Louisiana Corporation with its principal place of business in New Orleans, Louisiana. SM Insurance participated and conspired to participate in the predicate acts that form the pattern of racketeering alleged below.

99.     **All known wrongdoers are defendants in this case and their misconduct is described below.**

100.    **The alleged victims and how the alleged victims were injured:** Plaintiff Jordella Robinson, a resident of Harvey, Louisiana, is a victim of the alleged RICO violations. Additional victims include the putative class of all persons who have or had a mortgage loan or line of credit owned, originated or serviced by Standard Mortgage and/or its affiliates secured by property located in United States and, in connection therewith, were charged for "force-placed" insurance on the secured property. Plaintiff and the Class paid or were charged falsely inflated, unauthorized force-placed insurance premiums by reason, and as a direct, proximate and foreseeable result, of the predicate acts that form the pattern of racketeering alleged below.

101.    Furthermore, the owners of the loans that Standard Mortgage services also are victims of Defendants' predicate acts. When borrowers failed to pay force placed insurance on loans that Defendants serviced, Defendants would misrepresent the cost of the force placed insurance when Defendants sought reimbursement for those costs from the owners and guarantors of the loans (such as Fannie Mae and Freddie Mac). As a result, the owners of the loans would pay inflated amounts to Defendants for the force placed insurance premiums.

<u>The Pattern of Racketeering Activity</u>

102.    **The alleged predicate acts and the specific statutes violated:** The predicate acts constitute violations of mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, honest services fraud under 18 U.S.C. § 1346, and extortion and attempted extortion under 18 U.S.C. § 1951(a).

103.    **The alleged predicate acts relate to the enterprise as part of a common plan.** The predicate acts described below relate to the Enterprise, and were performed as part of the common plan to further the conspiracy to generate money for Standard Mortgage and SM Insurance by eschewing competitive pricing and by gouging customers. Without the alleged predicate acts,

Defendants could not have successfully achieved the goals of their common plan.

104.   At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this Complaint. The Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct.

105.   Standard Mortgage enters into servicing agreements with owners and/or holders of whole loans. The servicing agreements provide, *inter alia*, that Standard Mortgage is obligated to maintain continuous insurance on the secured properties.

106.   Standard Mortgage buys force-placed insurance from SM Insurance or its affiliates with respect to the loans Standard Mortgage services. Standard Mortgage pays insurance premiums to SM Insurance for the force-placed insurance.

107.   Standard Mortgage hires SM Insurance as a subcontractor to perform Standard Mortgage's "insurance tracking" responsibilities.

108.   Standard Mortgage and SM Insurance, and their affiliates conceal from the public, borrowers, and loan owners that Standard Mortgage pays SM Insurance below market price for its insurance tracking services and that SM Insurance is also compensated by the insurance company and underwriters for these services.

109.   SM Insurance or its affiliates pay rebates or kickbacks to Standard Mortgage.

110.   The money to pay the rebates or kickbacks is derived from Standard Mortgage's force-placed insurance premiums. The amount of the rebates or kickbacks is computed as a percentage of Standard Mortgage's force-placed insurance premiums.

111.   The rebates and kickbacks are paid in the form of below-market cost tracking

services and bogus "commissions."

112.     The bogus "commissions" are paid by SM Insurance to Standard Mortgage or an affiliate of Standard Mortgage on the false pretense that the affiliate is a third-party insurance agent. SM Insurance falsely labels these payments as "commissions."

113.     As a *quid pro quo* for the rebates and kickbacks, Standard Mortgage continues to procure force-placed insurance from SM Insurance or its affiliates for inflated, noncompetitive prices and continues to outsource insurance tracking to SM Insurance.

114.     Standard Mortgage retains the rebates/kickbacks for itself, while billing and charging borrowers based on the full purported price of the force-placed insurance. The rebates/kickbacks reduce Standard Mortgage's force-placed insurance costs, but those savings are not passed through to borrowers. Instead, borrowers are billed and charged the full purported price of the force-placed insurance even though that does not reflect the actual cost of the insurance policy.

115.     Additionally, when borrowers make their mortgage payments, Standard Mortgage subtracts the inflated amounts billed with respect to force-placed insurance off the top before applying any balance to principal, interest, or other charges.

116.     Because amounts paid for force-placed insurance are servicing advances, Standard Mortgage has inflated charges to borrowers by failing to pass through the rebates and kickbacks to borrowers. Standard Mortgage reimburses itself from the proceeds of the loans based on the inflated servicing advances. To the extent borrowers fail to pay, loan owners bear the inflated charges.

117.     SM Insurance computes the amounts purportedly due and issues notices to borrowers fraudulently setting forth the balances owed for force-placed insurance based on the

25

full prices of the force-placed insurance premiums without subtracting the rebates and kickbacks.

118.    SM Insurance represents to consumers that notices are issued by Standard Mortgage.

119.    The notices and letters are on Standard Mortgage letterhead although SM Insurance sends those letters and notices.

120.    Standard Mortgage approved and directed the issuance of the notices.

121.    The notices materially omit that Standard Mortgage is already reimbursed for a portion of the inflated premium by SM Insurance. By requiring borrowers to pay the full price of the inflated premium, Standard Mortgage gives itself a windfall.

122.    The notices are materially false by representing that borrowers are responsible for the cost of insurance when they actually are responsible for more than just the cost of the insurance. They are charged for the undisclosed "commission" that Standard Mortgage receives.

123.    To the extent that any notices that Defendants issue reveal that either Defendant will receive any kind of compensation in connection with the force-placed insurance, that statement was objectively false and misleading because it failed to disclose, *inter alia*: (1) Standard Mortgage "always" will receive compensation (instead of "may" receive compensation); (2) Standard Mortgage and its affiliates had preexisting agreements with SM Insurance that guaranteed that Standard Mortgage would receive a substantial rebate or kickback; (3) the compensation paid to Standard Mortgage, including below-market cost portfolio-monitoring and rebate/kickbacks, is not in connection any actual services rendered, and thus is not earned compensation but instead is a kickback; (4) under the agreements, Standard Mortgage was not compensated for the placement of the individual policies or certificates but rather was rebated or kicked-back money for agreeing to enter into exclusive force-placed insurance and

outsourcing agreements with SM Insurance.

124.    The notices and statements lull borrowers into believing that no fraudulent scheme is occurring and that Standard Mortgage and SM Insurance and/or their affiliates are simply exercising Standard Mortgage's rights under borrowers' mortgage loan agreements. By lulling Plaintiff and the Class into a false sense of security, the notices and statements make it less likely that borrowers will object to the improper charges, complain to the authorities, or bring lawsuits.

125.    Standard Mortgage issues remittance reports, monthly servicing reports, and annual certifications of compliance to loan owners that include information about Standard Mortgage's compensation, advances, and reimbursements. The reports and certifications fraudulently set forth balances for Standard Mortgage's advances and reimbursements based on the full prices of the force-placed insurance without subtracting the rebates and kickbacks. The reports and certifications also fraudulently exclude the compensation that Standard Mortgage derives from the kickbacks and rebates, which are not disclosed in the reports and certifications. Moreover, the reports and certifications fraudulently conceal that SM Insurance is not meaningfully compensated by Standard Mortgage from Standard Mortgage's own funds but, instead, through the force-placed insurance premiums, despite the fact that Standard Mortgage is thereby breaching its agreements with loan owners. The reports and certifications also omit that Standard Mortgage unjustly enriched itself by acting outside of its contractual authority within the mortgage loan agreements by billing borrowers for reimbursement of force-placed insurance costs in amounts in excess of Standard Mortgage's actual costs.

126.    The remittance reports, monthly servicing reports, and annual certifications of compliance lull loan owners into believing that no fraudulent scheme is occurring and that

Defendants are simply exercising Standard Mortgage's rights under their servicing agreements. By lulling loan owners into a false sense of security, the remittance reports, monthly servicing reports, and annual certifications of compliance notices and statements make it less likely that loan owners will object to the improper charges, complain to the authorities, or bring lawsuits.

### The Predicate Acts of Mail and Wire Fraud

127.   The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, the Enterprise engaged in an intentional scheme or artifice to defraud borrowers and the owners of the loans serviced by Standard Mortgage and to obtain money or property from said borrowers and loan owners through false or fraudulent pretenses, representations and promises.

128.   The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of Standard Mortgage and SM Insurance and their affiliates in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

129.   It was reasonably foreseeable to Standard Mortgage and SM Insurance and their affiliates that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

130.   The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants. Nevertheless, Plaintiff can allege such transmissions generally.

131.   For the purpose of furthering and executing the scheme, Standard Mortgage and SM Insurance and their affiliates regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also

regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

(a)    SM Insurance issued materially false and misleading notices relating to force-placed insurance to borrowers via mail;

(b)    SM Insurance also communicated to borrowers with respect to force-placed insurance issues by telephone;

(c)    Standard Mortgage issued monthly statements incorporating the falsely overstated force-placed insurance charges to borrowers via mail and/or wire;

(d)    Standard Mortgage issued materially false and misleading remittance reports, monthly servicing reports and annual certifications of compliance to loan owners via the mail and/or electronically via wire;

(e)    SM Insurance and/or Standard Mortgage received force-placed insurance payments from borrowers via mail and/or wire; and

(f)    SM Insurance transmitted funds to Standard Mortgage's affiliates reflecting purported "commissions" via mail and/or wire.

132.    Standard Mortgage and SM Insurance and their affiliates utilized the mails and/or wires for the purpose of furthering and executing the scheme. As Standard Mortgage's insurance tracking subcontractor, SM Insurance drafts and issues standardized notices to borrowers.

133.    Prior to the placement of force-placed insurance, SM Insurance issues notices to borrowers demanding evidence of insurance and warning that Standard Mortgage will force place coverage if such evidence is not forthcoming. Once force-placed insurance is imposed, SM Insurance issues a letter (on Standard Mortgage letterhead) to inform borrowers that it has

obtained coverage.

134.   **Dates of the predicate acts:** Standard Mortgage sent Plaintiff these false and misleading notices on September 7, 2012, September 28, 2012, October 26, 2012, November 24, 2012, and January 4, 2013.

135.   Plaintiff explains which statements in these letters were fraudulent and why in Section E of the Factual Allegations, above. Plaintiff incorporates by reference that section here.

136.   These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Standard Mortgage, SM Insurance and their affiliates. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Standard Mortgage, SM Insurance and their affiliates engaged in similar activities with respect to each member of the Class and with respect to the owners of the loans of each member of the Class.

137.   Each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

138.   Standard Mortgage, SM Insurance and their affiliates each participated in the scheme to defraud knowingly, willfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring falsely inflated, unauthorized charges in connection with force-placed insurance.

139.   The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur the falsely inflated, unauthorized charges with respect to force-placed insurance

30

and thereby enable Standard Mortgage, SM Insurance and their affiliates to reap illicit profits.

140.    Standard Mortgage, SM Insurance and their affiliates were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and owners of the loans.

### Honest Services Fraud

141.    The scheme alleged herein also constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

142.    The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

143.    The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

144.    The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

145.    18 U.S.C. § 1346 provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

146.    Through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

147.    In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes

31

"fraudulent schemes to deprive another of honest services through bribes or kickbacks." *Id.* at 404. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.* at 365.

148.    At all relevant times, Standard Mortgage owed legal duties to render services to loan owners and borrowers. In all cases, those duties included maintaining continuous insurance coverage on the secured properties. The value of Standard Mortgage's services depended on Standard Mortgage rendering those services in an honest manner. Nevertheless, Standard Mortgage misused its position as the servicer of the loans to extract bribes and kickbacks from SM Insurance. Standard Mortgage thereby breached its obligation to render "honest services" to loan owners and borrowers. Standard Mortgage and SM Insurance devised a scheme or artifice to defraud borrowers of their intangible right to Standard Mortgage's honest services through kickbacks.

### The Predicate Acts of Extortion, Attempted Extortion, And Conspiracy to Commit Extortion

149.    The pattern of racketeering activity also consisted of extortion, attempted extortion, and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

150.    As alleged above, the mortgage loan agreements of Plaintiff and the Class authorize the lender to charge borrowers the costs of any insurance force-placed on their property. Nothing in the agreements authorizes the lender to charge any amount in excess of the lender's cost. Pursuant to the scheme alleged herein, however, Plaintiff and the Class were

charged amounts in excess of Standard Mortgage's force-placed costs with respect to the borrowers' property. The rebates/kickbacks that Standard Mortgage received reduced such costs. Nevertheless, Standard Mortgage charged borrowers based on the full purported price of the force-placed insurance.

151.    At all relevant times, by virtue of the conduct alleged above, Standard Mortgage, SM Insurance and their affiliates induced, and attempted and conspired to induce, Plaintiff and the Class to pay these extra-contractual amounts, which were in excess of Standard Mortgage's force-placed insurance costs and not due under their respective mortgage loan agreements, through the wrongful use of actual or threatened fear of economic harm. Specifically, Standard Mortgage, SM Insurance and their affiliates used, and attempted and conspired to use, the actual or threatened fear of default and foreclosure to induce Plaintiff and the Class to pay the improper charges imposed.

152.    As alleged above, the mortgage loan agreements of Plaintiff and the Class entitled Standard Mortgage to add any force-placed insurance charges to the balances of their loans and to foreclose in order to collect such charges if unpaid. The mortgage loan agreements provide, in words or substance, that any insurance charges "shall become an additional debt of Borrower and be secured by this Security Instrument," Exhibit 1 (Mortgage) at ¶ 7, and that the lender or its authorized servicer is entitled to foreclose to collect any unpaid amounts due.

153.    Standard Mortgage routinely collected unpaid force-placed insurance charges through foreclosure. The force-placed insurance charges described above frequently pushed distressed Class members over the foreclosure cliff.

154.    By virtue of the facts alleged above, Plaintiff and the Class reasonably believed: (i) that Standard Mortgage possessed the power to collect any unpaid force-placed insurance

charges through foreclosure; and (ii) that Standard Mortgage would exploit that power and foreclose if borrowers failed to pay the insurance charges that Standard Mortgage and SM Insurance imposed.

155.    Additionally, by virtue of the facts alleged above, Standard Mortgage, SM Insurance and their affiliates agreed to engage in the acts alleged above, and intentionally performed acts, including, without limitation, the acts alleged above, and under the circumstances as Standard Mortgage, SM Insurance and their affiliates believed them to be, constituted violations of the Hobbs Act and/or substantial steps in the commission of a Hobbs Act violation. Moreover, Defendants and their affiliates thereby affected and intended to affect interstate commerce.

156.    Plaintiff and the Class received nothing of value in exchange for payment of the excess force-placed insurance charges.

### The Enterprise

157.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants Standard Mortgage and SM Insurance, and their affiliates ("Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

158.    Defendants constitute the association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

159.    No Defendant is an employee, officer, or director of the Enterprise.

160.    Each Defendant is a member of the Enterprise.

161.    Defendants are entities separate and apart from the Enterprise itself. Both Defendants are members of the Enterprise and perpetrators of the racketeering activity alleged

34

above.

162.    **The enterprise has an ascertainable structure that is separate and apart from the pattern of racketeering activity.** Defendants engage in to further the common purpose of the enterprise. Defendants have associated to pursue their common purpose through predicate acts against thousands of borrowers in violation of Section 1962(c) and (d) since at least 2009.

163.    The Enterprise was primarily managed by Standard Mortgage, which organized the fraudulent scheme and procured the involvement of SM Insurance.

164.    Alternatively, the Enterprise was managed by SM Insurance, which organized the fraudulent scheme and procured the involvement of Standard Mortgage.

165.    Each of the Defendants, however, agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent discretion.

166.    The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers and loan owners by overcharging them for force-placed insurance with respect to Standard Mortgage-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners of the loans to incur, overcharges in respect to such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, Standard Mortgage and SM Insurance, and their affiliates.

167.    The Enterprise operated from at least 2009 and its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

168.    Standard Mortgage hires SM Insurance as a subcontractor to perform Standard Mortgage's "insurance tracking" duties under Standard Mortgage's servicing agreements.

Insurance tracking is a labor-intensive servicing responsibility related to force-placed insurance. It consists of monitoring the status of homeowners' voluntary insurance to confirm that it is in force, notifying homeowners of any insurance deficiencies, and securing force-placed insurance when appropriate.

169.   Standard Mortgage, together with SM Insurance and its affiliates, devised and carried out a scheme to defraud borrowers and loan owners by overcharging them for force-placed insurance. Pursuant to the scheme, SM Insurance and its affiliates pay Standard Mortgage secret rebates, *i.e.*, kickbacks, camouflaged through complex transactions using affiliates and related parties. Standard Mortgage pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the force-placed insurance. In other words, the rebates reduce Standard Mortgage's force-placed insurance costs, but those savings are not passed through to borrowers. Because the amounts supposedly paid by Standard Mortgage for force-placed insurance constitute "servicing advances," loan owners bear the inflated charges through reduced loan proceeds and higher loss severities to the extent borrowers fail to pay.

170.   Any amounts paid by the servicer to buy force-placed insurance count as "servicing advances" under pooling and services agreement and other agreements between the servicer and the loan owner. The servicer is entitled to recoup such advances from the proceeds of the loan, whether through payments made by the borrower or, if the borrower defaults, through proceeds at foreclosure. Additionally, the servicer has the right to be reimbursed before any money is passed through to the securitization trust or other loan owner. In other words, the servicer gets paid "off the top." In this respect, servicers are functionally the senior-most creditors with respect to the loans they manage; their rights are senior even to those of the owners of the loans.

171.   As devised by Standard Mortgage and/or SM Insurance, the scheme involves the payment of rebates/kickbacks in at least two forms: (i) below-market tracking services and (ii) bogus "commissions."

172.   The below-market cost portfolio monitoring and tracking services are provided by SM Insurance. More specifically, the insurers and underwriters compensate SM Insurance for force-placing insurance, which includes compensation for its tracking services. Standard Mortgage pays only nominal consideration. The below market cost for tracking services constitutes rebates/kickbacks in kind.

173.   The bogus "commission" paid by SM Insurance to Standard Mortgage or to Standard Mortgage's affiliates is also a kickback. As with the tracking services, the money for the "commissions" is derived from the force-placed insurance premiums paid by Standard Mortgage. The "commission" payments are made on the pretense that a third-party insurance agent introduced the insurance customer, i.e., Standard Mortgage, to SM Insurance and its affiliates. At all relevant times, however, this pretense has been false.

174.   Standard Mortgage received the kickbacks from SM Insurance.

175.   Taxpayer-backstopped Government Sponsored Enterprises ("GSEs") Fannie Mae, Freddie Mac, and Ginnie Mae, which own and/or guarantee more than two-thirds of the loans serviced by Standard Mortgage, have also been grossly overcharged for force-placed insurance as a result of the scheme.

176.   **The relationship between the activities of the enterprise and the pattern of racketeering:** The Defendants' force-placed insurance enterprise has a clear organizational structure that delineates specific duties to each of the involved entities. SM Insurance has been charged with providing portfolio-monitoring services (for below-market rate) and force-placing

insurance policies onto Standard Mortgage borrowers. SM Insurance charges several times the market rate for insurance to borrowers, like Plaintiff, who paid four times the cost of her original insurance for SM Insurance's policy, and splits the profits of its non-competitive policies with Standard Mortgage through an undisclosed kickback. Defendants' predicate acts are necessary to further the common purpose of the enterprise—profiting from overpriced, noncompetitive insurance policies placed onto unknowing borrowers.

177.   **How the racketeering activity differs from the usual and daily activities of the Enterprise:** Defendants have associated to force-place insurance on Standard Mortgage borrowers. The Enterprise's racketeering activity significantly increases profits from that which Defendants would individually make if Defendants legitimately force-placed insurance with full and honest disclosure to borrowers and/or without kickbacks.

178.   **The Enterprise benefitted from the pattern of racketeering.** The enterprise benefits from the pattern of racketeering by deceiving Standard Mortgage borrowers into believing that the amount Standard Mortgage charges them represents the actual cost of insurance. By fooling its borrowers and loan owners, Standard Mortgage and SM Insurance are able to multiply profits obtained through the force-placed insurance premiums.

179.   **The effect of the Enterprise's activities on interstate commerce:** For the purpose of furthering and executing the scheme, Standard Mortgage and SM Insurance and their affiliates regularly transmitted and caused to be transmitted by means of the mail and wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be sent or delivered by a private or commercial interstate carrier. Defendants' enterprise engaged in predicate acts against borrowers in all states in which Standard Mortgage does business.

180.   **Who is employed by or associated with the enterprise:**  Defendants Standard Mortgage and SM Insurance are associated with the enterprise and are liable as "persons" under section 1962(c).

181.   **The same entity is not both liable as a "person" and the "enterprise" under 1962(c).** Neither Standard Mortgage nor SM Insurance alone constitute the Enterprise itself. Instead, each Defendant is part of the association-in-fact enterprise.

<u>Injury to Plaintiff and the Class</u>

182.   **Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).** Plaintiff and the Class paid or were charged falsely inflated, unauthorized force-placed insurance premiums by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

183.   **The relationship between the alleged injury and violation of the RICO Statute:** The violation of the RICO statute is the direct and proximate cause of the injuries suffered by Plaintiff and the Class. The predicate acts misled Plaintiff and the Class to believe that the "insurance premium" represented the actual cost of the insurance policy, not an inflated cost that included the cost of an undisclosed kickback. Had Plaintiff been aware that the high premium Defendants asserted was due, not to the cost of force-placed insurance, but rather to a substantial kickback to Standard Mortgage, Plaintiff would have procured her own insurance.

184.   Moreover, overcharging Plaintiff and the Class for force-placed insurance was an integral and necessary part of the scheme, as those overcharges constituted purported "servicing advances" that Standard Mortgage was entitled to recoup "off the top" from the proceeds of the loans.

185.   **The damages sustained by reason of the violation of Section 1962:** The

damages sustained by reason of Defendants' violation of Section 1962 equals the amount Defendants were able to overcharge Plaintiff and members of the Class for their force-placed insurance premiums, times three for treble damages. The precise amount owed to Plaintiff and the Class requires discovery to ascertain.

186.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

187.    SM Insurance is directly liable for its own violations of RICO, as alleged above.

188.    As alleged above, at all times relevant herein, when SM Insurance committed the RICO violations alleged herein, SM Insurance was acting within the course and scope of its authority as an authorized agent of Standard Mortgage and its affiliates.

### COUNT II

### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 U.S.C. § 1962(d)
### (Against All Defendants)

189.    Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

190.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

191.    As set forth in Count I, above, at all relevant times, Plaintiff and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

192.    Defendants and their affiliates formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and loan owners with respect to force-placed insurance. The purpose

40

thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated, unauthorized charges with respect to force-placed insurance.

193.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

194.    As set forth in Count I, above, Defendants and their affiliates conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

195.    Defendants and their affiliates were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

196.    Defendants and their affiliates committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

197.    As a direct and proximate result of the overt acts and predicate acts of Defendants in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business and property in an amount to be determined at trial. Such injuries include, but are not limited to, fraudulently inflated charges with respect to force-placed insurance, as a direct, proximate and foreseeable result of the scheme alleged herein.

198.    Under the provisions of 18 U. S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing

this suit, including reasonable attorneys' fees.

199.     Standard Mortgage and SM Insurance are directly liable for their own RICO conspiracy violations, as alleged above. Standard Mortgage and SM Insurance are also liable for the RICO conspiracy violations of each other as well as for the RICO conspiracy violations of their agents. As alleged above, pursuant to the scheme, Standard Mortgage engaged SM Insurance to provide Standard Mortgage with tracking services. At all times relevant herein, when SM Insurance committed the RICO conspiracy violations alleged herein, SM Insurance was acting within the course and scope of its authority as an authorized agent of Standard Mortgage.

## COUNT III

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against STANDARD MORTGAGE)

200.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

201.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

202.     Where an agreement affords one party the power to make discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

203.     Plaintiff and the Class members' mortgage contracts allow Standard Mortgage to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for need to fix formatting selecting an insurer or procuring an insurance policy.

204.     Standard Mortgage is afforded substantial discretion in force-placing insurance coverage. It is permitted to unilaterally choose the company from which it purchases force-

42

placed insurance and negotiate any price for the coverage it procures. Standard Mortgage has an

obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith.

Plaintiff does not seek to vary the express terms of the mortgage contract, but only to insure that

Standard Mortgage exercises it discretion in good faith.

205.   Standard Mortgage breached the implied covenant of good faith and fair dealing

by, among other things:

> (a) Manipulating the force-placed insurance market by selecting insurers (here, SM Insurance) with inflated premiums that include kickbacks to Standard Mortgage and issuing excess insurance coverage not necessary to cover Standard Mortgage's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from SM Insurance without seeking a competitive price;
>
> (b) Exercising its discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance policies with artificially inflated premiums to maximize its own profits;
>
> (c) Assessing inflated, duplicative, and unnecessary amounts for force-placed insurance against Plaintiff and the Class and misrepresenting the reason for the cost of the policies;
>
> (d) Allowing Standard Mortgage and its affiliates to collect a percentage of the amounts charged to Plaintiff and the Class as a kickback and passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;
>
> (e) Charging Plaintiff and the Class for commissions when the insurance is prearranged and no commission is due;
>
> (f) Charging Plaintiff and the Class the cost of having the vendor perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiff or the Class;
>
> (g) Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(h) Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan; and

(i) Charging Plaintiff and the Class an inflated premium due to the captive reinsurance arrangement.

206.   As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

## COUNT IV
## UNJUST ENRICHMENT/DISGORGEMENT
### (against Standard Mortgage)

207.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

208.   Standard Mortgage has been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct. The kickbacks, commissions and other compensation that Standard Mortgage received in connection with force-placed insurance were not legitimately earned, and came at the ultimate expense of its customers who had insurance force-placed on them.

209.   Standard Mortgage accepted and retained these payments under such circumstances that it would be inequitable for Standard Mortgage to retain the benefit without payment to Plaintiff and the other Class members.

210.   Plaintiff and the Class members have conferred a substantial benefit upon Standard Mortgage from the force-placed insurance premiums paid by Plaintiff and the Class members.

211.   As a result of Standard Mortgage's unjust enrichment, Plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek a full disgorgement and restitution of Standard Mortgage's enrichment, benefits, and ill-gotten gains

44

acquired as a result of the unlawful or wrongful conduct alleged above and throughout the Complaint.

## COUNT V

### UNJUST ENRICHMENT
### (against SM Insurance)

212.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

213.   SM Insurance has been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct.

214.   SM Insurance gave Standard Mortgage, either directly or through an affiliate, a kickback disguised as a legitimate commission, but Standard Mortgage did not provide any services that entitled it to a commission.

215.   SM Insurance came to an agreement with Standard Mortgage and its affiliates to inflate premium prices charged to borrowers so that it could kick back to Standard Mortgage a percentage of that money.

216.   As consideration for this agreement, SM Insurance became the exclusive insurer for Standard Mortgage borrowers who were force-placed.

217.   In addition to the benefit of not competing in the insurance market for policies, SM Insurance was able to charge more than the market price for an insurance policy. While SM Insurance kicked back a portion of this amount to Standard Mortgage and/or its affiliates, SM Insurance retained a substantial portion of these inflated premiums at the expense of Plaintiff and the Class.

218.   Plaintiff and the Class have thus conferred a substantial benefit upon SM Insurance.

219.   Under such circumstances, it would be inequitable for SM Insurance to retain

these benefits without payment to Plaintiff and the other Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

A. Determining that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Designating Plaintiff as the Class representative;

C. Designating Plaintiff's counsel as counsel for the Class;

D. Issuing proper notice to the Class at Defendants' expense;

E. Declaring that Defendants' conduct violated RICO;

F. Declaring that Standard Mortgage's conduct as alleged herein violated Standard Mortgage's duty of good faith and fair dealing;

G. Declaring that Defendants' conduct as alleged herein was inequitable and that Defendants were unjustly enriched by their conduct;

H. Declaring that Defendants acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiff and the Class as alleged herein;

I. Awarding appropriate equitable relief, including restitution and an injunction requiring Defendants to reverse all unlawful, unfair, or otherwise improper charges for insurance coverage, allowing customers to close loans without first paying premiums for insurance that were not necessary or required by law, prohibiting Defendants from imposing unfair and unlawful insurance requirements on borrowers, prohibiting Defendants from earning commissions or other compensation for themselves or affiliated entities on force-placed insurance policies, and requiring Defendants to cease and desist from engaging in further unlawful conduct in the future;

J. Awarding actual damages, treble damages, punitive damages, and interest;

K. Awarding reasonable attorneys' fees and costs to the full extent permitted by law; and

L. Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

Dated: December 3, 2015

Respectfully submitted,

**SQUITIERI & FEARON, LLP**

By: /s/ Stephen J. Fearon, Jr.
Stephen J. Fearon, Jr. (admitted *pro hac vice*)
Raymond N. Barto (admitted *pro hac vice*)
Thomas G. O'Brien (admitted *pro hac vice*)
**SQUITIERI & FEARON, LLP**
32 East 57th Street, 12th Floor
New York, New York  10022
Tel:    (212) 421-6492
Fax:   (212) 421-6553
Email: stephen@sfclasslaw.com
           raymond@sfclasslaw.com
           thomas@sfclasslaw.com

**JERNIGAN LAW FIRM**
Susanne Weiner Jernigan
829 Baronne Street
New Orleans, LA  70113
Tel:    (504) 581-9322
Fax:   (866) 703-7621
Email: sue@thejerniganfirm.com

**THE LAW OFFICES OF RONALD L. WILSON**
Ronald L. Wilson
701 Poydras Street, Suite 4100
New Orleans, LA  70139
Tel:    (504) 525-4361
Fax:   (504) 525-4380
Email: cabral2@aol.com

*Counsel for Plaintiff and the Proposed Class*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand a trial by jury.

By: /s/ Stephen J. Fearon, Jr.
Stephen J. Fearon Jr.
**SQUITIERI & FEARON, LLP**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of December 2015, a copy of the foregoing AMENDED COMPLAINT-CLASS ACTION AND DEMAND FOR JURY TRIAL was filed electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system.

By: /s/ Stephen J. Fearon, Jr.
Stephen J. Fearon, Jr.

49