UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JORDELLA ROBINSON,                  CIVIL ACTION
INDIVIDUALLY AND AS A
REPRESENTATIVE OF A CLASS
OF SIMILARLY SITUATED
BORROWERS

VERSUS                             NO.   15-4123

STANDARD MORTGAGE          SECTION: R
CORPORATION and STANDARD
MORTGAGE INSURANCE
AGENCY, INC.

## ORDER AND REASONS

Defendants Standard Mortgage Corporation and Standard Mortgage Insurance Agency, Inc. move the Court to dismiss plaintiff's claims under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and 1962(d), for failure to state a claim.[1] Because plaintiff fails to plausibly allege racketeering activity based on the predicate acts of mail fraud, wire fraud, honest services fraud, or extortion, the Court grants defendants' motion.

---

[1] R. Doc. 39.

# I. BACKGROUND

## A. Defendants' Alleged Force-Placed Insurance Arrangement

Mortgage lenders often require homeowners to maintain hazard insurance on the mortgaged property to protect the lender's interest in the collateral. When a homeowner fails to obtain the required coverage, the lender has the option to independently obtain insurance and add the cost of the premiums to the principal due under the note. This is known as a "force-placed" insurance policy or "lender-placed insurance." *See Caplen v. SN Servicing Corp.*, 343 Fed. App'x 833, 834 (3d Cir. 2009).

In her Amended Complaint, Robinson alleges that Standard Mortgage Corporation, the servicer of the mortgage on her home, colludes with Standard Mortgage Insurance ("SM Insurance") to manipulate the force-placed insurance market by artificially inflating the amounts that borrowers pay for coverage.[2] According to Robinson, defendants' force-placed insurance scheme proceeds as follows.

Standard Mortgage gives SM Insurance and its affiliates the exclusive right to receive premiums for force-placed insurance for Standard Mortgage's portfolio of loans whenever a borrower fails to obtain or maintain insurance

_____

[2] R. Doc. 38 at 6 ¶ 27.

coverage.[3]  As part of the agreement, SM Insurance monitors Standard Mortgage's portfolio to ensure mortgaged properties remain adequately insured.[4]  SM Insurance provides this service to Standard Mortgage for only nominal consideration.[5]  When a borrower fails to obtain insurance coverage, Standard Mortgage and/or SM Insurance notify the borrower of the deficiency.[6]  If the borrower does not take corrective action, defendants force-place insurance on the property, charging premiums that are allegedly well in excess of the cost of borrower-obtained insurance coverage.[7]

Once force-placed insurance coverage begins, Standard Mortgage advances premiums to SM Insurance and adds the cost of the advances to the principal due under the borrower's note.[8]  SM Insurance and its affiliates then pay a portion of the premium back to Standard Mortgage or to a subsidiary allegedly posing as an insurance agent.[9]  SM Insurance styles these payments as "commissions" allegedly on the pretense that a third party facilitated the

---

[3] *Id.* at 11 ¶ 48.

[4] *Id.* at 11 ¶ 49, 35-36 ¶ 168.

[5] *Id.* at 35 ¶ 168, 37 ¶ 172.

[6] *Id.*

[7] *Id.*

[8] *Id.* at 25 ¶ 114, 115.

[9] *Id.* at 37 ¶ 173.

pre-determined insurance transaction.[10]  The payments are allegedly a "kickback" that SM Insurance pays Standard Mortgage in exchange for the privilege of collecting "inflated, noncompetitive" premiums from Standard Mortgage's borrowers.[11]  Together with the low-cost monitoring services that SM Insurance provides, these payments significantly reduce Standard Mortgage's force-placed insurance costs.[12]  But Standard Mortgage does not pass these savings along to its borrowers.[13]  Instead, it allegedly "retains the rebates/kickbacks itself" and falsely charges borrowers "based on the full purported price of the force-placed insurance."[14]

Allegedly, the harm to borrowers does not stop with Standard Mortgage's failure to pass along force-placed insurance savings.  According to Robinson, Standard Mortgage actively seeks force-placed insurance policies that provide little value to its borrowers.[15]  Because Standard Mortgage's kickback payments increase with gross force-placed insurance premiums,

---

[10] *Id.*

[11] *Id.*

[12] *Id.* at 38 ¶ 114.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 9 ¶ 37.

Standard Mortgage allegedly purchases the most expensive force-placed insurance available.[16]

## B.    The Force-Placed Arrangement Applied to Robinson

Robinson alleges that she was victimized by defendants' force-placed insurance scheme.   The facts of her case, as alleged in the Amended Complaint, are as follows.  In 2004, Robinson purchased a home in Harvey, Louisiana and mortgaged it to her lender, Standard Mortgage.[17] The mortgage agreement required Robinson to "insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards" and mandated that the insurance "be maintained in the amounts and for the periods that Lender requires."[18]  The agreement also authorized Standard Mortgage to purchase insurance on the property if Robinson failed to do so and to add the costs of the premiums to the principal due under the note.[19]

Robinson initially purchased a homeowner's insurance policy with an annual premium of approximately $2,000.[20]  Eight years later, the policy

---

[16] *Id.*

[17] *Id.* at 12 ¶ 53.

[18] *Id.* at 12 ¶ 54.

[19] *Id.*

[20] *Id.* at 13 ¶ 56.

lapsed.[21]  On September 7, 2012, Standard Mortgage sent a letter to Robinson notifying her that Standard Mortgage's records reflected an absence of coverage and requesting proof of insurance coverage within 20 days.[22]  The letter informed Robinson that if she did not provide proof of coverage, "it will be necessary for us to secure coverage at your expense."[23]  It further stated:

> Because we will not have all of the information that you would normally provide when purchasing coverage directly, the rate for the coverage we acquire may be higher than what you might otherwise be able to obtain.  The premium will be $8,820.00.[24]

On October 26, 2012, Standard Mortgage sent a nearly identical letter to Robinson, again requesting proof of insurance within 20 days and stating that the premium for force-placed insurance would be $8,845.20.[25]  Like the first letter, the October 26, 2012 letter explained the high premium amount on

---

[21] R. Doc. 40 at 3.

[22] R. Doc. 38 at 13 ¶ 58; *see also* R. Doc. 39-4 at 1.  When considering a motion to dismiss, courts may rely upon "documents incorporated into the complaint by reference . . . ." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).  Documents "attache[d] to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).  Robinson mentions Standard Mortgage's letters in her complaint and relies on representations contained within those letters for her mail and wire fraud claims.  The Court will therefore consider the letters in their entirety in ruling on defendants' motion to dismiss.

[23] R. Doc. 38 at 13 ¶ 58; *see also* R. Doc. 39-4 at 1.

[24] R. Doc. 39-4 at 1.

[25] R. Doc. 38 at 13 ¶ 60; *see also* R. Doc. 39-6 at 1.

the grounds that "we will not have all of the information that you would normally provide when purchasing coverage directly."[26]

Ten weeks later, Standard Mortgage informed Robinson that it still had not received acceptable proof of hazard insurance. By letter dated January 4, 2013, Standard Mortgage indicated that it had therefore secured an insurance policy on the mortgaged property at a cost of $8,845.20.[27] The letter explained that if Robinson provided Standard Mortgage with proof of coverage under an acceptable replacement policy, "we will cancel our coverage and promptly refund any unearned portion of the premium."[28] According to the Amended Complaint, Standard Mortgage purchased the force-placed insurance from SM Insurance, and Standard Mortgage withdrew approximately $8,000 from Robinson's escrow account to pay SM Insurance's artificially inflated premium.[29]

Robinson characterizes several aspects of Standard Mortgage's communications as materially false and misleading. For instance, Standard Mortgage's September 7, 2012 and October 26, 2012 letters stated that

---

[26] R. Doc. 39-6 at 1.

[27] R. Doc. 38 at 14 ¶ 63; R. Doc. 38-1 at 10.

[28] R. Doc. 38-1 at 10.

[29] R. Doc. 38 at 15 ¶ 66.

7

Robinson's force-placed insurance premium would be higher due to Standard Mortgage's lack of property and homeowner-specific information. Robinson alleges that the premium was actually higher because it included the cost of cash and in-kind kickback for Standard Mortgage.[30] Robinson further alleges that "had [she] been aware that the high premium Defendants asserted was due, not to the cost of force-placed insurance, but rather to a substantial kickback to Standard Mortgage, [she] would have procured her own insurance."[31]

### C.    Robinson's Amended Claim and RICO Allegations

On September 3, 2015, Robinson filed this putative class action lawsuit against Standard Mortgage and SM Insurance. In her Amended Complaint, Robinson alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count One); conspiracy to violate RICO, 18 U.S.C. § 1962(d) (Count Two); breach of the implied covenant of good faith and fair dealing (Count Three); and unjust enrichment (Counts Four and Five). Robinson asserts her civil RICO and RICO conspiracy claims individually and on behalf of a proposed nationwide class of "all persons who have or had a mortgage loan or line of credit owned, originated or serviced by

---

[30] *Id.* at 14 ¶ 65, 67.

[31] *Id.* at 39 ¶ 183.

Standard Mortgage and/or its affiliates secured by property located in the United States and, in connection therewith, were charged for 'force-placed' insurance on the secured property within the applicable statute of limitations."[32]  Robinson proposes a sub-class for her state law claims comprised of similar property owners in Louisiana.[33]

As to her civil RICO claim, Robinson alleges an association-in-fact enterprise comprised of Standard Mortgage, SM Insurance, and their affiliates.[34] Allegedly, the enterprise had the common purpose of "defrauding borrowers and loan owners by overcharging them for force-placed insurance with respect to Standard Mortgage-serviced loans."[35]  Robinson alleges that the enterprise engaged in a pattern of racketeering, marked by three predicate acts.  First, defendants committed mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.[36]  In furtherance of a scheme to defraud borrowers, defendants allegedly sent false and misleading notices to Robinson and

---

[32] *Id.* at 19 ¶ 81.

[33] *Id.* at 19 ¶ 82.

[34] *Id.* at 34 ¶ 157.

[35] *Id.* at 35 ¶ 166.

[36] *Id.* at 28 ¶ 127.

putative class members by means of mail and wire communication.[37] Second, defendants engaged in honest-services fraud, in violation of 18 U.S.C. § 1346. Standard Mortgage allegedly "owed legal duties to render services to loan owners and borrowers" but "misused its position as the servicer of the loans to extract bribes and kickbacks from SM Insurance."[38] Third, defendants extorted or conspired to extort borrowers in violation of the Hobbs Act, 18 US.C. § 1951(a). Specifically, defendants allegedly "used and attempted and conspired to use, the actual or threatened fear of default and foreclosure to induce" borrowers to pay kickbacks and fees in excess of the costs of insuring their properties.[39]

### D.    Defendants' Motion to Dismiss

Standard Mortgage and SM Insurance move to dismiss Robinson's civil RICO claims under Federal Rule of Civil Procedure 12(b)(6), asserting several arguments for dismissal.[40] Specifically, defendants argue that Robinson fails to plausibly allege (1) the existence of an enterprise that is distinct from Standard Mortgage and SM Insurance, (2) the predicate acts of mail and wire

---

[37] *Id.* at 28 ¶ 128, 131, 134.

[38] *Id.* at 32 ¶ 148.

[39] *Id.* at 33 ¶ 151.

[40] R. Doc. 39-1.

fraud, or (3) an injury proximately caused by a RICO violation. In addition, defendants argue that Robinson fails to state a RICO conspiracy claim because she has not adequately pleaded an underlying, substantive RICO violation.

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true. *Iqbal*, 556 U.S. at 678. It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Id.* In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each

element of the plaintiff's claim. *Lormand*, 565 F.3d at 257. If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed. *Twombly*, 550 U.S. at 555.

## III.  DISCUSSION

In Count I of the Amended Complaint, Robinson alleges that defendants violated RICO, 18 U.S.C. § 1962(c), by overcharging for force-placed insurance and misleading borrowers about the reason for the excessive prices. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." *Id.* at 1962(c).  To withstand a motion to dismiss, a civil RICO plaintiff must allege facts sufficient to establish each of the essential elements of his or her RICO claim. *See Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998). A plaintiff must allege specific facts concerning (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see also Elliott v. Foufas*, 867 F.2d 877,

880 (5th Cir. 1989) (finding that each of RICO's essential elements "is a term of art which carries its own inherent requirements of particularity"). Defendants argue that Robinson fails to adequately allege any elements of a RICO cause of action.

### A.    The Person/Enterprise Distinction

Defendants' first argument implicates the distinctiveness requirement of section 1962(c). Because "a RICO person cannot employ or associate with himself," *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995), a plaintiff asserting a section 1962(c) violation must demonstrate the existence of two distinct entities: "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *see also Old Time Enterprises, Inc. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1217 (5th Cir. 1989) (noting that the "person" who engaged in racketeering "must be must be distinct from the enterprise whose affairs are thereby conducted"). Here, the Amended Complaint identifies two RICO "persons," defendants Standard Mortgage and SM Insurance--both of which are corporations and which appear to be affiliated.[41]

---

[41] Although the Amended Complaint does not specifically allege that Standard Mortgage and SM Insurance are affiliated entities, it does allege that both corporations share the "Standard Mortgage" name and a single business address. R. Doc. 39 at 4 ¶ 15, 5 ¶ 19.

The alleged "enterprise" is an association-in-fact consisting of Standard Mortgage, SM Insurance, and unnamed affiliates of each corporation.[42]

Defendants argue that because Robinson alleges that Standard Mortgage and SM Insurance are both RICO persons and members of an association-in-fact enterprise, her civil RICO claim fails the distinctiveness requirement as a matter of law. In support, defendants cite *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425 (5th Cir. 2000). There, the court rejected the argument that an individual defendant may never be both a RICO person and one of several members of an association-in-fact enterprise. *Id.* at 446-47. In so doing, it reasoned that because a corporate entity cannot simultaneously be a "person" and an "enterprise," a different analysis might apply when, as in this case, the defendant is a corporation, rather than an individual. *See id.* The court explained that "[t]o get around having a corporation named as both a RICO defendant and a RICO enterprise, many plaintiffs have charged the corporation as being part of an association-in-fact enterprise and also as a RICO defendant. *Courts have roundly criticized this formulation.*" *Id.* at 447 n. 16 (emphasis added).

---

[42] R. Doc. 38 at 34 ¶ 157.

As a general rebuke of Robinson's pleading methodology, *St. Paul Mercury* supports defendants' position. But *St. Paul Mercury* is distinguishable from this case because it involved an individual defendant, not a corporate entity like Standard Mortgage or SM Insurance. Thus, the Court is not convinced by defendants' argument that *St. Paul Mercury*'s footnote constitutes a clear holding that two corporations can never serve as both RICO persons and as members of an association-in-fact enterprise. *Compare Glob. Oil Tools, Inc. v. Barnhill*, No. CIV.A. 12-1507, 2012 WL 5866139, at *10 (E.D. La. Nov. 19, 2012) (dismissing RICO claim when plaintiff alleged that a corporation was both a "person" and a member of an association-in-fact enterprise); *with Burford v. Cargill, Inc.*, No. CIV.A. 05-0283, 2011 WL 4382124, at *5 (W.D. La. Sept. 20, 2011) ("[A] corporate defendant [can] simultaneously be a RICO person and a member of an association-in-fact enterprise. . . ." (quoting *TransFirst Holdings, Inc. v. Phillips*, No. 06–2303, 2007 WL 1468553, *3 (N.D. Tex. May 18, 2007)).

The Court therefore turns to defendants' second argument--that Robinson fails to establish a pattern of racketeering activity.

### B.    Pattern of Racketeering Activity

To allege a "pattern of racketeering activity," a plaintiff must show that the defendant committed two or more predicate offenses that are (1) related

and (2) amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Predicate offenses include violations of certain state and federal laws, including the wire and mail fraud statutes and the Hobbs Act, which prohibits extortion. 18 U.S.C. § 1961(1). Here, Robinson asserts that the predicate acts of mail and wire fraud, honest services fraud, and extortion provide the basis for the pattern of racketeering needed for a RICO violation.

### 1. Mail and Wire Fraud

The elements of wire fraud are "(1) a scheme to defraud, and (2) the use of, or causing the use of, wire communications in furtherance of that scheme." *United States v. Rush*, 236 F. App'x 944, 947 (5th Cir. 2007). Proof of a scheme to defraud requires a showing that the defendant possessed a fraudulent intent. *Id.* "The elements of mail fraud are (1) a scheme to defraud; (2) use of the mails to execute the scheme; and (3) the specific intent on the part of the defendant to defraud." *United States v. Smith*, 46 F. App'x 225, 2002 WL 1939843, at *2 (5th Cir. July 16, 2002). "Among other things, both RICO mail and wire fraud require evidence of intent to defraud, *i.e.*, evidence of a scheme to defraud by false or fraudulent representations." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000).

A scheme to defraud is measured by a "nontechnical standard," rooted in notions of moral uprightness, fundamental honesty, fair play, and right dealing. *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973). Although this standard is broad, a scheme to defraud must involve fraudulent misrepresentations or omissions "reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Netterville*, 553 F.2d 903, 909 (5th Cir. 1977).

Federal Rule of Civil Procedure 9(b)'s pleading requirements apply to RICO claims resting on allegations of fraud, and a plaintiff must plead his fraud-based RICO claims with particularly. *See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). To satisfy Rule 9(b), "a plaintiff must state the factual basis for the fraudulent claim with particularity and cannot rely on speculation or conclusional allegations." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008). In general, such a statement should include the "time, place, and contents of the false representation[ ], as well as the identity of the person making the misrepresentation and what that person obtained thereby." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009) (quoting *United States ex rel. Russell v. Epic Healthcare Mgmt. Group.*, 193 F.3d 304, 308

(5th Cir. 1999)); *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).

Here, many of Robinson's fraud allegations lack the specificity that Rule 9(b) demands. For instance, Robinson contends that Standard Mortgage and SM Insurance initiated a number of mail and/or wire communications, including "notices," "monthly statements," "remittance reports," and "monthly servicing reports."[43] Although Robinson alleges, in a conclusory manner, that each communication was "materially false and misleading,"[44] she provides no details about the contents of any of these documents. Nor does she specify when defendants made these communications or to whom, specifically, they were directed. Such vague, general allegations are plainly insufficient to state a plausible claim for relief. *See, e.g., Gustafson v. BAC Home Loans Servicing, LP*, No. SACV 11-915-JST ANX, 2012 WL 7051318, at *5-*6 (C.D. Cal. Dec. 20, 2012) (dismissing fraud claim under Rule 9(b) when complaint referred generally to "notices, telephone calls, correspondence and other communications"); *Hill v. Hunt*, No. CIV A 307-CV-2020-O, 2010 WL 54756, at *4 (N.D. Tex. Jan. 4, 2010) (dismissing fraud claim under Rule 9(b) when complaint did "not identify any particular mail or wire communication(s),

---

[43] R. Doc. 38 at 28-29 ¶ 131.

[44] *Id.*

[defendant's] relationship to the communication(s), when or how the communication was made, or why the communication was fraudulent").

Robinson provides more detailed allegations concerning letters and notices that Standard Mortgage sent her from September 2012 to January 2013, but the disclosures contained in those letters defeat any claim of fraud or misrepresentation. As Robinson acknowledges, her mortgage agreement required her to maintain hazard insurance and authorized Standard Mortgage to force-place insurance on the mortgage property if Robinson failed to do so.[45] After Robinson's borrower-obtained insurance lapsed, Standard Mortgage's September 7, 2012 letter informed her of the deficiency, asked her to submit proof of insurance coverage, and stated that failure to act would cause Standard Mortgage to force-place insurance with a rate of coverage "higher than what you might otherwise be able to obtain."[46] Indeed, the letter defined the cost of inaction with precision, stating that "[t]he premium will be $8,820.00."[47] Thus, from the outset, Standard Mortgage informed Robinson that she would have to pay a substantially higher premium--several times

---

[45] *Id.* at 12 ¶ 54.

[46] *Id.* at 13 ¶ 58.

[47] *Id.* Apparently, a later letter, dated October 26, 2012 provided Robinson an additional 20 days to provide proof of insurance and informed her that the force-placed insurance premium would be $ 8,845.20. R. Doc. 39-6 at 1.

more than what she had been paying--if force-placed insurance became necessary and urged Robinson to give the matter her attention. Standard Mortgage's subsequent letters to Robinson contained the same or similar disclosures.[48] And Robinson does not allege that her force-placed insurance premium differed from the price the letters described.

Despite these clear disclosures, Robinson argues that Standard Mortgage's letters were misleading because they attributed the high cost of insurance to Standard Mortgage's lack of property and homeowner-specific information when, allegedly, bogus commissions and other undisclosed "kickbacks" were to blame. Similarly, Robinson contends that the letters' use of the terms "rate of coverage" and "premium" is misleading because the amount defendants charged Robinson was unmoored to the actual cost of providing insurance coverage. These arguments are unpersuasive.

Standard Mortgage repeatedly warned Robinson that she lacked adequate insurance and that failure to cure would prompt Standard Mortgage to purchase force-placed insurance priced at nearly $9,000. Like several other district courts that have considered similar allegations in the force-placed insurance context, the Court finds these disclosures inconsistent with a

---

[48] *See* R. Doc. 39-6 at 1.

scheme to defraud. *See Meyer v. One W. Bank, F.S.B.*, 91 F. Supp. 3d 1177, 1184 (C.D. Cal. 2015) (dismissing RICO claim involving similar allegations, reasoning that "[plaintiff's] tortured interpretation of relatively straightforward language [in a force-placed insurance notice letter] cannot plausibly be read as evincing fraudulent intent"); *Wilson v. EverBank, N.A.*, No. 14-CIV-22264, 2015 WL 1600549, at *3 (S.D. Fla. Apr. 9, 2015) (dismissing civil RICO claim when lender informed borrower that force-placed insurance would cost substantially more than borrower-obtained insurance and that increased amount would be charged to borrowers); *Gustafson*, 2012 WL 7051318, at *7 (finding that similar force-placed insurance kickback and nondisclosure claims fail as a matter of law).

Robinson correctly notes that other district courts have reached a different conclusion in similar lawsuits. *See, e.g.*, *Montoya v. PNC Bank, N.A.*, 94 F. Supp. 3d 1293, 1317-19 (S.D. Fla. 2015); *Perryman v. Litton Loan Servicing, LP*, No. 14-CV-02261-JST, 2014 WL 4954674, at *15 (N.D. Cal. Oct. 1, 2014); *Cannon v. Wells Fargo Bank. N.A.*, No. C-12-1376 EMC, 2014 WL 324556, at *2-*3 (N.D. Cal. Jan. 29, 2014). But these cases are not binding on this Court, and the Court finds their analyses, or lack thereof, unpersuasive.

As explained, Standard Mortgage notified Robinson that failing to correct an insurance deficiency would result in the imposition of force-placed

insurance; it accurately disclosed the amount that Robinson would be charged for force-placed insurance coverage; and it informed Robinson that she would probably be able to obtain less expensive coverage by purchasing her own insurance policy. Robinson had previously obtained her own insurance on the same property for four times less money. And she was given multiple opportunities to avail herself of that option to avoid a known higher cost to herself. Simply put, "[t]he Court cannot see how letters that warn of an imminent bad deal and urge one to seek better, could possibly be calculated to deceive anyone." *Weinberger v. Mellon Mortgage Co.*, No. CIV.A. 98-2490, 1998 WL 599192, at *5 (E.D. Pa. Sept. 10, 1998).

Moreover, setting aside the disclosures in Standard Mortgage's letters, Robinson's "kickback" allegations are facially implausible. Robinson alleges that SM Insurance pays commissions to Standard Mortgage and/or certain, unnamed affiliate companies from its force-placed insurance premiums. She further alleges that, in exchange for the right to serve as Standard Mortgage's exclusive force-placed insurance provider, SM Insurance monitors Standard Mortgage's property portfolio for insurance gaps--allegedly for only nominal consideration. Robinson labels these benefits "kickbacks." But, as the Seventh Circuit explained in a recent force-placed insurance case, "simply calling [a] commission a kickback doesn't make it one." *Cohen v. Am. Sec. Ins. Co.*, 735

22

F.3d 601, 611 (7th Cir. 2013). Rather, "[t]he defining characteristic of a kickback is divided loyalties." *Id.*; *see also Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1111 (11th Cir. 2014) (same).

Standard Mortgage was not subject to divided loyalties when it force-placed insurance on Robinson's property. The mortgage agreement makes clear that the insurance requirement exists to protect *the lender's* interest in the mortgaged property: "Borrower shall insure all improvements on the property . . . against any hazards, casualties, and contingencies, including fire, *for which Lender requires insurance*. This insurance shall be maintained in the amounts and for the periods *that Lender requires*."[49] The mortgage agreement also empowers the lender to protect its interest by "do[ing] and pay[ing] whatever is necessary to protect the value of the Property and the Lender's rights in the property. . . ."[50] Nothing in these terms requires the lender to purchase the cheapest insurance or the insurance that provides the most value for the borrower. Thus, Standard Mortgage did not act on Robinson's behalf when it force-placed insurance coverage; it acted to protect its *own interest* in the mortgaged property--an interest that Robinson threatened by breaching her own contractual duty to maintain insurance

---

[49] R. Doc. 39-3 at 3.

[50] *Id.* at 4.

23

coverage. So although Robinson sprinkles her complaint with the "kickback" label, the commissions and portfolio monitoring that SM Insurance provided to Standard Mortgaged were "not . . kickback[s] in any meaningful sense." *Cohen*, 735 F.3d at 611 (holding that commission paid to mortgage lender's affiliate for force-placing insurance was not a "kickback" when the lender "was subject to an undivided loyalty to itself, and it made this clear from the start"); *see also Feaz*, 745 F.3d at 1111 (agreeing with *Cohen*'s analysis).[51]

Given the clear disclosures in Standard Mortgage's letters, as well as Robinson's failure to plausibly allege an unlawful kickback arrangement, the Amended Complaint does not state a claim for a violation of the federal mail and wire fraud statutes.

### 2. Honest Services Fraud

Robinson also charges Standard Mortgage with honest services fraud. "The elements of honest services fraud include (1) a scheme to deprive another of the right to honest services; (2) use of the mails and/or wires to execute the

---

[51] Robinson tries to distinguish *Cohen* on the grounds that the mortgage lender in that case disclosed that it would receive a commission from its force-placed insurance provider, whereas Standard Mortgage's letters contained no such disclosures. Robinson also notes that the homeowner in *Cohen* did not allege that the commissions were unearned, while Robinson makes that claim in her Amended Complaint. While accurate, these distinctions miss the broader point that an unlawful kickback arrangement requires divided loyalties. *Cohen*, 735 F. 3d at 611. No such division appears from Robinson's well-pleaded factual allegations.

scheme; and (3) materiality of the falsehoods employed in the scheme." *United States v. Hoeffner*, 626 F.3d 857, 868 (5th Cir. 2010). According to the Amended Complaint, Standard Mortgage owed borrowers a legal duty to ensure continuous insurance coverage on mortgaged properties, and it breached this duty by devising a scheme to "extract bribes and kickbacks from SM Insurance."[52] These allegations share the same defect as Robinson's mail fraud and wire fraud claims--Robinson's failure to plausibly allege a scheme intended to deceive. Thus, Robinson's honest services fraud claims also fail to establish the predicate act that RICO demands.

### 3.    *Extortion*

Finally, Robinson attempts to ground her RICO claim in the predicate acts of extortion and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. Section 1951(b)(2) defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

Robinson alleges that Standard Mortgage, SM Insurance, and unspecified affiliates "used, and attempted and conspired to use, the actual or threatened fear of default and foreclosure to induce [Robinson] and the Class

---

[52] *Id.* at 32 ¶ 148.

to pay" premiums in excess of Standard Mortgage's force-placed insurance costs.[53] But despite its length, the Amended Complaint does not identify a single, specific instance of threatening conduct by either Standard Mortgage or SM Insurance. Instead, it offers only broad, general assertions such as "Standard Mortgage routinely collected unpaid force-placed insurance charges through foreclosure,"[54] and "[Robinson] and the Class reasonably believed . . . that Standard Mortgage would exploit [its apparent contractual] power and foreclose if borrowers failed to pay the insurance charges that Standard Mortgage and SM Insurance imposed."[55] Such vague, conclusory allegations are insufficient to state a plausible extortion claim. Absent supporting factual allegations, Robinson's claim must be dismissed. *See Morris v. Green Tree Servicing, LLC*, No. 2:14-CV-01998-GMN, 2015 WL 4113212, at *13 (D. Nev. July 8, 2015) (characterizing allegation that defendant "threatened that Plaintiff's credit would be destroyed, that his home would be foreclosed on, and that it was Plaintiff's fault that his loan was in default" as conclusory and insufficient to establish an extortion claim); *Valdez v. Saxon Mortgage Servs., Inc.*, No. 2:14-CV-03595-CAS, 2014 WL 7968109, at *15 (C.D. Cal. Sept. 29,

---

[53] *Id.* at 33 ¶ 151.

[54] *Id.* at 33 ¶ 153

[55] *Id.* at 33-34 ¶ 154.

2014) (dismissing extortion claim grounded in allegation that defendants "used, and attempted and conspired to use, the actual or threatened fear of foreclosure to induce Plaintiff and the Class to pay the improper charges imposed" for failure to state a claim).

Even setting aside the dearth of well-pleaded factual allegations, Robinson's extortion theory is implausible. The Amended Complaint alleges that Standard Mortgage coerced Robinson and similarly situated borrowers into paying artificially-inflated force-placed insurance premiums. As noted, however, Robinson had a contractual duty to maintain continuous insurance coverage on her mortgaged property. And while Standard Mortgage eventually force-placed insurance on Robinson's property--as the mortgage agreement expressly authorized it to do--the choice to purchase her own, less expensive insurance was available to Robinson at every turn. Standard Mortgage explained this to Robinson on several occasions. After Robinson's borrower-obtained insurance lapsed, Standard Mortgage mailed Robinson a series of letters asking her to submit proof of a new insurance policy and warning that inaction would necessitate force-placed insurance coverage at a rate of $8,820.[56] When force-placed insurance went into effect, Standard

_____

[56] R. Doc. 39-4 at 1; R. Doc. 39-6 at 1.

Mortgage sent Robinson another letter reminding her that she need only present proof of insurance and the force-placed insurance coverage would be cancelled and the premium refunded on a pro rata basis.[57]

The Seventh Circuit addressed a similar situation in *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013). There, Wachovia force-placed insurance on a borrower, who sued under the Illinois Consumer Fraud and Deceptive Business Practices Act, alleging that she and a putative class were "coerced into having insurance provided by [an insurer] at a price far above that which they had previously paid." *Id.* at 609. The district court dismissed this count for failure to state a claim, and the Seventh Circuit affirmed. The court explained that the borrower

> never lacked a meaningful choice to avoid expensive lender-placed property insurance. Wachovia reminded her at every step that she could comply with her obligation to purchase insurance or have the coverage placed by Wachovia at a much higher cost. To use the Illinois Supreme Court's formulation, there was a "total absence of oppressiveness" because all along she "could have gone elsewhere" to buy cheaper insurance.

*Id.* at 610. Although *Cohen* involved claims under Illinois law, the Seventh Circuit's analysis applies to Robinson's Hobbs Act claims as well. Like the borrower in *Cohen*, Robinson could have avoided force-placed insurance by

---

[57] R. Doc. 38 at 14 ¶ 63; R. Doc. 38-1 at 10.

simply purchasing borrower-obtained insurance--insurance that her mortgage agreement required her to maintain. Thus, for all of Robinson's conclusory assertions of extortion, the facts alleged evince a "total absence of oppressiveness" on the part of Standard Mortgage.

In sum, Amended Complaint fails to state a plausible claim of racketeering activity by Standard Mortgage or SM Insurance. Although Robinson has had two opportunities to plead her claims--once with the benefit of defendants' Rule 12(b)(6) motion challenging her original complaint--she has failed to adequately allege mail fraud, wire fraud, honest services fraud, or extortion. Accordingly, Robinson's civil RICO claim against Standard Mortgage and SM Insurance must be dismissed.

## C.    Causation

Although Robinson's failure to plead racketeering activity is itself fatal to her claim, Robinson also fails to plausibly allege causation. RICO provides civil remedies to "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). "An injured party must show that the violation was the but-for and proximate cause of the injury." *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)). In cases predicated on mail or wire fraud, first-party reliance is not a necessary element. *Bridge*,

533 U.S. at 655-56. The Supreme Court has explained, however, that "in most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." *Id.* at 658. In general, "a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Id.* at 659.

Here, Robinson's causation claim rest on allegations of first-party reliance. Robinson's core theory is that Standard Mortgage's fraudulent mailings led her to believe that her force-placed insurance premium represented the "actual cost of the insurance policy," not a cost inflated by undisclosed kickbacks. Robinson alleges that these misrepresentations were material to her decision-making. According to the Amended Complaint, "[h]ad Plaintiff been aware that the high premium Defendants asserted was due, not to the cost of force-placed insurance, but rather to a substantial kickback to Standard Mortgage, Plaintiff would have procured her own insurance."[58] Defendants argue that this after-the-fact allegation is insufficient to establish that Standard Mortgage's mailings caused Robinson not to purchase her own insurance to avoid the force-placed alternative.

---

[58] R. Doc. 38 at 39 ¶ 183.

The Court draws on "judicial experience and common sense" to determine whether Robinson's Amended Complaint states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Common sense casts significant doubt on Robinson's causation allegations. Standard Mortgage repeatedly notified Robinson that her insurance coverage had lapsed and that, if she failed to take corrective action, it would become "necessary for us to secure coverage at your expense."[59] Standard Mortgage's letters did not mislead Robinson about how much she would be charged for force-placed insurance coverage; they plainly stated that "[t]he premium will be $8,845.20."[60] Nor did the letters attempt to "lull" Robinson into inaction by suggesting, for example, that Robinson would be unable to obtain cheaper coverage on the insurance market. *Cf. Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 445 (5th Cir. 1992) (recognizing that publications, if used "to lull [plaintiff] into not resisting the efforts to fire him, . . . could be part of the fraud underlying the RICO offense"). To the contrary, Standard Mortgages's letters accurately explained that "the rate for the coverage we acquire may be

---

[59] R. Doc. 38 at 13 ¶ 58; *see also* R. Doc. 39-4 at 1.

[60] R. Doc. 39-4 at 38 at 13 ¶ 60; *see also* R. Doc. 39-6 at 1.

higher than what you might otherwise be able to obtain."[61]  Having previously purchased her own insurance on the same property for four times less money, Robinson knew how much cheaper borrower-obtained insurance would likely be.  And she was given multiple opportunities to avail herself of that option to avoid a known higher cost to herself.  Instead, she took no action, prompting Standard Mortgage to force-place insurance on the mortgaged property.

Given her inaction in the face of a known, imminent detriment to herself, Robinson's bare assertion that she would have acted differently had she known that Standard Mortgage stood to benefit rings false.  *See Wilson* 77 F. Supp. 3d at 1227 ("Plaintiffs have not even alleged with the requisite plausibility that, but for EverBank's allegedly fraudulent conduct regarding the force-placed insurance charges . . . Plaintiffs would not have paid the full force-placed insurance charges but, rather, would have opted either to now get their own insurance. . . .").  Absent additional factual allegations to support or explain this assertion, Robinson's pleadings fail to "nudge[] [her] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 547.  Accordingly, the Amended Complaint fails to plausibly allege that Robinson's injuries were

---

[61] R. Doc. 39-6 at 1.

caused by Standard Mortgage's alleged mail fraud, and Robinson's civil RICO claims must be dismissed.

### D. RICO Conspiracy

Count II of the Amended Complaint alleges that Standard Mortgage and SM Insurance conspired to violate RICO in violation of 18 U.S.C. § 1962(d). Because Robinson's allegations fail to state a substantive RICO claim upon which relief may be granted, her conspiracy claim fails as well. *See Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, 930 (5th Cir. 2002) ("The failure to plead the requisite elements of either a § 1962(a) or a § 1962(c) violation implicitly means that [Nolen] cannot plead a conspiracy to violate either section."); *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."); *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000) (same). Therefore, the Court dismisses Robinson's RICO conspiracy claims against both defendants.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss Robinson's RICO claims.

New Orleans, Louisiana, this __7th__ day of June, 2016.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE